Docket No. 23-14186-B

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

*KAREN FINN, et al.,*                          *Plaintiffs-Appellees,*

*v.*

*COBB COUNTY BOARD OF ELECTIONS*          *Defendants-Appellees,*
*& REGISTRATION, et al.,*

*and*

*COBB COUNTY SCHOOL DISTRICT,*            *Intervenor-Appellant.*

---

On appeal from the United States District Court for the Northern
District of Georgia; Civil Action File No. 1:22-CV-02300-ELR

---

## BRIEF OF INTERVENOR-APPELLANT
## COBB COUNTY SCHOOL DISTRICT

---

Philip W. Savrin
William H. Buechner, Jr.
P. Michael Freed
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339
(770) 818-0000

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

The following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.    ACLU Foundation of Georgia, Inc. – Counsel for Plaintiffs

2.    Anderson, Scott Eric – Counsel for Intervenor-Appellant

3.    Buechner, Jr., William H. – Counsel for Intervenor-Appellant

4.    Cobb County Board of Elections and Registration – Defendant

5.    Cobb County School District – Intervenor-Appellant

6.    Crumly, Jonathan, D. – Counsel for Intervenor-Appellant

7.    Daly, Hylah – Plaintiff

8.    Dulcio, Jenne – Plaintiff

9.    Eveler, Janine – Defendant (in her official capacity)

10.   Freed, P. Michael – Counsel for Intervenor-Appellant

11.   Freeman Mathis & Gary, LLP – Counsel for Intervenor-Appellant

i

12. Finn, Karen – Plaintiff

13. Ford, Dr. Jillian – Plaintiff

14. Galeo Latino Community Development Fund, Inc. – Plaintiff

15. Garabadu, Rahul – Counsel for Plaintiffs

16. Georgia Coalition for the Peoples Agenda, Inc. – Plaintiff

17. Gold, Sofia Fernandez – Counsel for Plaintiffs

18. Greenbaum, Jon – Counsel for Plaintiffs

19. Haynie, Litchfield & White, PC – Counsel for Defendants Cobb County Board of Elections and Janine Eveler in her official capacity

20. Heard, Bradley E. – Counsel for Plaintiffs

21. Houk, Julie M. – Counsel for Plaintiffs

22. Isaacson, Cory – Counsel for Plaintiffs

23. Koff, Douglas I. – Counsel for Plaintiffs

24. Lawyers' Committee for Civil Rights Under Law – Counsel for Plaintiffs

25. League of Women Voters of Marietta-Cobb – Plaintiff

26. Loperfido, Jeff – Counsel for Plaintiffs

27. O'Donnell, Courtney – Counsel for Plaintiffs

28.  May, Caitlin – Counsel for Plaintiffs

29.  Mott, Thomas L. – Counsel for Plaintiffs

30.  New Georgia Project Action Fund – Plaintiff

31.  Price, Savannah – Counsel for Plaintiffs

32.  Rosenberg, Ezra D. – Counsel for Plaintiffs

33.  Ross, Honorable Eleanor L. – United States District Judge

34.  Savrin, Philip W. – Counsel for Intervenor-Appellant

## STATEMENT ON ORAL ARGUMENT

The District believes oral argument is necessary given the important issues presented by the appeal and the unique procedural history that enabled the District Court to enter a preliminary injunction as unopposed following its improper termination of the District's right to intervene, thereby leaving only nominal defendants in the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ............................................. i

STATEMENT ON ORAL ARGUMENT .................................................. iv

TABLE OF AUTHORITIES .................................................................. viii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES.............................................................. 2

STATEMENT OF THE CASE ................................................................ 2

    I.    Course of Proceedings Below ................................................... 2

    II.    Facts ........................................................................................ 5

        A.    The District explores possibility of redistricting
            in 2021 .......................................................................... 5

        B.    Tyson meets with Board members individually
            to propose redistricting maps ....................................... 7

        C.    The Board votes along party lines to recommend
            a redistricting map to the Georgia General
            Assembly ...................................................................... 9

        D.    The State enacts the District's recommended
            map .............................................................................. 10

        E.    Appellees challenge the redistricted map .................... 10

            1.    Appellees name nominal parties only,
                causing the District to intervene ....................... 10

            2.    The District finds Appellees could not
                sustain a claim against the District but
                does not decide the merits of their racial
                gerrymandering claim......................................... 11

3.  The District Court ousts the District as
    an intervenor ................................................... 12

4.  The Election Defendants capitulate to an
    injunction against the redistricted map ............ 13

F.  The District Court Sets An Impossible Deadline
    For Legislature To Adopt Remedial Map .................. 17

III.  Standard of Review ........................................ 18

SUMMARY OF THE ARGUMENT ........................................ 19

ARGUMENT ....................................................... 21

I.  The District has standing to appeal the preliminary
    injunction as an intervenor or on equitable grounds .......... 22

    A.  The District has Standing as an Intervenor .............. 22

    B.  The District has Standing on Equitable Grounds
        ....................................................... 26

II.  The District Court Abused its Discretion in Entering
     the Preliminary Injunction ................................. 27

    A.  Appellees' motion was grossly untimely .................. 27

    B.  Appellees did not show that Race was the
        "Predominant Factor" Motivating the General
        Assembly to Adopt the Map ............................... 30

        1.  The District Court improperly adopted
            Appellees' "cat's paw" theory to impute
            racial motivation to the General
            Assembly ........................................... 32

        2.  The District Court ignored evidence of
            constitutional partisanship considerations
            that predominated the map-drawing ................. 34

vi

C.    The District Court erred in concluding that District 3 was the product of unlawful racial gerrymandering................................................ 40

1.    The District Court ignored Tyson's testimony that he would have drawn the same or substantially the same majority-black district without the need to comply with the VRA........................................ 40

2.    The District Court erred in concluding that District 3 would not satisfy strict scrutiny despite Tyson's good reason to believe that retaining a majority Black district was necessary to comply with the VRA .................................................. 42

III.    The District Court abused its discretion by failing to provide a "reasonable opportunity" for the Legislature to redraw the map ............................. 46

CONCLUSION ........................................................ 50

CERTIFICATE OF COMPLIANCE....................................... 51

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................. 33, 45

Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254 (2015)... 43

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) ............................................. 27

Bethune-Hill v. Virginia State Bd. of Elections, 137 S.
   Ct. 786 (2017) .................................................................................... 31, 43

*Black Voters Matter Fund v. Raffensperger*, 508 F.
   Supp.3d 1283 (N.D. Ga. 2020) ............................................................ 27

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).... 20, 32, 33

*Bush v. Vera*, 517 U.S. 952 (1996) .......................................................... 34

*Easley v. Cromartie* 532 U.S. 234 (2001) ........................................ 34, 37

Four Seasons Hotels and Resorts, B.V. v. Consorcio
   Barr, S.A., 320 F.3d 1205 (11ᵗʰ Cir. 2003) ......................................... 35

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020) .......... 18, 21

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................. 35

*Hunter v. Underwood*, 471 U.S. 222 (1985) ............................................ 41

*In re Georgia Senate Bill 202*, 2023 WL 5334617
   (N.D. Ga. Aug. 18, 2023)..................................................................... 29

*Kentucky v. Graham*, 473 U.S. 159 (1985)............................................. 24

*Kimberly Regenesis, LLC v. Lee County*, 64 F.4th
   1253 (11th Cir. 2023) ................................................................. 1, 22, 26

*Miller v. Johnson*, 515 U.S. 900 (1995)........................... 30, 31, 33, 41, 43

Monell v. Department of Social Services of New
   York City, 436 U.S. 658 (1978)........................................... 3, 12, 24, 25

*Noble Prestige Limited v. Galle*, 83 F.4th 1366 (11th Cir. 2023) ................ 1

*Pals Group, Inc. v. Quiskeya Trading Corp.*, 2017
  WL 532299 (S.D. Fla. Feb. 9, 2017) ..................................................... 28

*Pettaway v. Galveston County*, --- F.Supp.3d ---,
  2023 WL 6786025 (S.D. Texas Oct. 13, 2023) ..................................... 46

*Pettaway v. Galveston County*, 86 F.4th 214 (5th Cir. 2023),
  *vacated and rehearing en banc granted*, 86 F.4th 1146
  (5th Cir. 2023) ...................................................................................... 46

*Pettaway v. Galveston County*, 87 F.4th 721 (5th Cir. 2023) ................... 46

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ................................... 34

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................ 43, 45

*Shaw v. Reno*, 509 U.S. 630 (1993) ...................................... 31, 41, 42, 43

Softwave Tissue Regeneration Technologies, LLC v.
  Kostopoulos, 2022 WL 19976189 (N.D. Ga. 2022) .............................. 28

Stringfellow v. Concerned Neighbors in Action, 480
  U.S. 370 (1987) ................................................................................. 1, 22

*Taveras v Bank of America, N.A.*, --- F.4th ---, 2024
  WL 41219 (11th Cir. Jan. 4, 2024) ..................................................... 19

*Thornburgh v. Gingles*, 478 U.S. 30 (1986) ........................................... 44

*United States v. Jim*, 891 F.3d 1242 (11th Cir. 2018) .............................. 1

*United States v. Under Seal*, 853 F.3d 706 (4th Cir. 2017) ................... 22

Village of Arlington Heights v. Metro Hous. Dev. Corp.,
  429 U.S. 252 (1977) ............................................................................. 41

*Whitest v. Crisp County School District*, 2023 WL
  8627498 (11th Cir. Dec. 13, 2023) ...................................................... 47

Wisconsin Legislature v. Wisconsin Elections Commission,
  142 S. Ct. 1245 (2022) (per curiam) ....................................... 30, 43, 45

*Wise v. Lipscomb*, 437 U.S. 535 (1978) ............................................ 46, 47

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016) ......... 28

**Statutes**

28 U.S.C. § 1292(a)(1) ...................................................................... 1

28 U.S.C. §§ 1331 ............................................................................ 1

28 U.S.C. §§ 1343 ............................................................................ 1

42 U.S.C. § 1983 ............................................................................. 2

Voting Rights Act ............................... vii, 14, 16, 38, 40, 41, 42, 44, 45, 46

**Other Authorities**

Fed. R. App. P. 4(a)(1)(A) ................................................................ 1

**Constitutional Provisions**

Ga. Const. Art. III, § 4, ¶ 1 .......................................................... 17, 47, 48

Ga. Const. art. III, § 9, ¶ II(b) ...................................................... 48

Ga. Const., Art. IX, § 2, ¶ I (c)(2) .............................................. 5, 32

## JURISDICTIONAL STATEMENT

The district court  had original subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343. The order entering a preliminary injunction is immediately appealable.  *See*, *e.g.*, 28 U.S.C. § 1292(a)(1); *Noble Prestige Limited v. Galle*, 83 F.4th 1366, 1375 (11th Cir. 2023).  The notice of appeal was filed timely on December 19, 2023, within 30 days of the District Court's December 14, 2023 Order granting Appellees' Motion for Preliminary Injunction. *See* FED. R. APP. P. 4(a)(1)(A).

An intervenor generally has a right to appeal an adverse order that is otherwise appealable.  *See*, *e.g.*, *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-76 (1987) (citing cases and other authorities); *United States v. Jim*, 891 F.3d 1242, 1245-1253 (11th Cir. 2018) (considering appeal of both defendant and intervenor). Because the District was improperly ousted as an intervenor, it has standing to appeal on this basis. Alternatively, the District has standing to appeal as a nonparty given its interest in the outcome of the litigation and its active participation in the proceedings below. *See Kimberly Regenesis, LLC v. Lee County*, 64 F.4th 1253, 1261 (11th Cir. 2023) (citing cases).

1

## STATEMENT OF THE ISSUES

1.    Whether the District has standing to appeal either because District Court lacked authority to terminate its right to intervene or on equitable grounds given the District's stake in the outcome and its active participation in the litigation?

2.    Whether the District Court abused its discretion in entering the preliminary injunction Appellees' motion was untimely, Appellees did not show a substantial likelihood of success on the merits, and the District would be irreparably harmed?

3.    Whether the District Court abused its discretion by giving Georgia's General Assembly only two weeks to enact a remedial map which would then be evaluated on par with other proposals so as to adopt a final map by February 9, 2024?

## STATEMENT OF THE CASE

### I.    Course of Proceedings Below

Appellees filed this lawsuit on June 9, 2022, asserting a single racial gerrymandering claim under 42 U.S.C. § 1983 as violating the Fourteenth Amendment's Equal Protection clause. (Doc. 37, ¶¶ 178-182.) Appellees sued only the Cobb County Board of Elections and its Director (referred to herein as "the Election Defendants"). (Doc. 1, 37.) The

2

District moved to intervene to protect its interests (Docs. 52), which the District Court granted on January 30, 2023. (Doc. 60).

Meanwhile, the Election Defendants had moved to dismiss the Amended Complaint for failure to state a claim (Doc. 43) after which the District moved for judgment on the pleadings seeking dismissal of *all* claims against *all* parties. (Docs. 83; 98, p. 14 ("Plaintiffs' complaint is due to be dismissed in its entirety."))  Following a hearing on the two motions (Doc. 137), the District Court entered an order on July 18, 2023, finding the Complaint failed to state a claim for liability under *Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978) with respect to the District, but found the action could proceed against the Election Defendants without mentioning the *Monell* standard. (Doc. 136). Thus, both the District and the Election Defendants filed motions for the claims against the Election Defendants to be dismissed under *Monell*. (Docs. 148, pp. 10-14; 149-1, pp. 10-11.)

Before ruling on the *Monell* motions with respect to the Election Defendants, the District Court announced at a telephone conference on September 12, 2023, that the District could no longer proceed as an

intervenor, which was memorialized in an order entered on November 2, 2023. (Doc. 182, pp.4-6; Doc. 199.)

Shortly after the District's intervention right was revoked, the Election Defendants reached an agreement with Appellees not to oppose an injunction against the map. (Doc. 190-1.) Immediately afterwards, Appellees moved for a preliminary injunction. (Doc. 194.) Although the Election Defendants did not respond to the motion (pursuant to the settlement agreement with Appellees), the District was allowed to submit an *amicus* brief which was supported by evidence opposing Appellees' contentions and arguments. (Docs. 200, 201, and 202.)

On December 14, 2023, the District Court granted Appellees' Motion for Preliminary Injunction and (at Appellees' suggestion) gave the legislature until January 10, 2024, to adopt a remedial map. (Doc. 212.) The District filed its notice of appeal on December 19, 2024. (Doc. 213.) At Appellees' request, the District Court then extended the deadline to January 22 for the legislature to adopt a remedial map. (Doc. 221.)

## II.    Facts

### A.    The District explores possibility of redistricting in 2021

Georgia's Constitution allows local governmental agencies, including school boards, to recommend redistricted maps after each decennial census to the General Assembly who then has the sole authority to enact local electoral maps. Ga. Const., Art. IX, § 2, ¶ I (c)(2). Thus, in May 2021, after the United States Census Bureau completed the 2020 census, the Cobb County Board of Education ("Board"), which is the District's governing body, looked into a possible new map for its seven districts to present to the General Assembly in 2021. (*Id.* at ¶¶94-96.) At the time, the Board was comprised four Republicans and three Democrats with Randy Scamihorn (a Republican) serving as the Chair. (Doc. 64 at ¶2.) The four Republican members each happened to be White, and the three Democratic members each happened to be Black. (*Id.*)

The exploration began with Chair Scamihorn and two District employees (John Floresta and Andy Steinhauser) met with attorney Bryan Tyson to discuss the possibility of retaining his firm, Taylor English Duma, LLP ("Taylor English"), to draw a redistricted map. (Doc. 200-2, pp. 14:4-15:17, 16:5-17:3.) Tyson, a long-time Cobb County

resident, has over 20 years of experience drawing redistricting plans in Georgia and other states, including the 2005 Georgia congressional redistricting. Tyson discussed that a population deviation of plus or minus five percent (for a total deviation of 10%) between districts is generally defensible as a safe harbor, but that most jurisdictions and the State Legislative and Congressional Redistricting Office ("LCRO") prefer a deviation of plus or minus one percent. (Doc. 200-2, pp. 26:19-27:11.) According to the 2020 census, the population deviation among the Board districts was plus or minus 7.66%. (Doc. 200-4, pp. 13-14, ¶¶ 36-40.) Ultimately, Taylor English was hired by the District on August 19, 2021,[1] by a 4-3 vote, with the four Republican Board members voting in favor, and the three Democrat Board members voting against.[2]

The District's general counsel, Nina Gupta, advised Tyson of his retention on August 24, 2021. (Doc. 200-8.)  On August 27, she sent him an email summarizing the essential terms for his retention that included:

---

[1] Doc. 37, 64, ¶ 2; Doc. 200-5, pp. 4:18-5:3, 6:6-22; Doc. 200-7, pp. 12:5-14:23.

[2] Doc. 194-37, pp. 3-12; Doc. 194-24, pp. 16-18, ¶¶ 28-32; Doc. 200-5, pp.2:2-9, 3:16-60:7; Doc. 200-6, pp.  2:18-3:8, 4:20-5:12; Doc. 200-7, pp. 9:8-11:9.

(1) the production of "a fair, nondiscriminatory and legal defensible redistricting map" for the Board; and (2) that "[a]ll Board members must have equal access to the TED attorneys involved and equal opportunity to provide meaningful input into the map, with that input meaningfully considered." (*Id.*)  Tyson agreed to these terms and signed the retention letter on October 12, 2021.

## B.    Tyson meets with Board members individually to propose redistricting maps

All Board members had equal access and input. Per Dr. Howard, a Democrat Board member, "we all had opportunity to meet with . . . [Tyson] . . . and give our opinions and draw maps and potential maps together with him".[3]  Indeed, Tyson either talked or met with all Board members, and Tyson drew proposed maps for each of the Democrat Board members based on their own criteria and priorities.[4]

Tyson also communicated with Steinhauser frequently who was authorized to speak on behalf of Chairman Scamihorn.[5] Steinhauser

[3] Doc. 200-10, pp. 2:13-25, 3:7-5:17, 6:24-8:3, 9:24-11:5, 12:13-25; Doc. 194-35, at pp. 8, 10).

[4] Doc. 200-2, pp. 40:10-41:20, 114:23; Doc. 194-35, at p. 8.

[5] Doc. 200-2, pp. 54:9-55:25, 57:7-9.

instructed Tyson that retaining a Republican majority on the Board was a primary goal for the proposed map he was preparing for Chairman Scamihorn (referred to as the Chair's Map).[6]  Tyson did so primarily by rotating the districts clockwise around the City of Marietta, a shift that was likely to result in the Republicans retaining their Board majority.[7]

As he was working on the map to be presented by Chairman Scamihorn (hereinafter, the "Chair's Map"), Tyson conferred with Steinhauser regarding how Republican Board members would perform politically under various configurations of the proposed map.  In that regard, Tyson and Steinhauser extensively reviewed precinct level political data gathered from various statewide and countywide races in 2018 and 2020 to assess the political performance of Republican Board members.[8] On December 4, 2021, Board member David Banks emailed Tyson stating that he would vote in favor of the Chair's map because it

---

[6] *Id.*, pp. 74:19-24, 113:10-17, 114:1-23, 116:19-24; 118:11-23; 147:11-16.

[7] Doc. 200-3, ¶¶ 7-8; Doc. 200-11, 2:5-3:6; Doc. 200-5, p. 7:12-15; Doc. 200-7, pp. 15-16:2, 18:25-19:8).

[8] Doc. 200-3, ¶¶ 5, 6; Doc. 200-3, pp. 8-9; Doc. 200-2, p. 175; Doc. 200-2, pp. 81:19-82:15.

"support[ed] the current *political majority*" and "will have the potential to maintain the current *political ratio*." (Doc. 200-12) (emphasis added).

The Chair's Map, along with a map proposed by Democrat Board member Hutchins, and a map proposed by Democrat Board member Davis, were presented to the entire Board for the first time on December 6, 2021.[9]  In a strategic political *and legal* maneuver, on the evening of December 8, 2021, Davis and Hutchins contacted Chairman Scamihorn and requested that their proposed redistricting maps be withdrawn from consideration. (Doc. 194-35, p. 13)  At the board meeting the next day, Hutchins and Davis withdrew their proposed maps, leaving only the Chair's Map for consideration for redistricting purposes. (Doc. 194-38, p. 8, at 2:52:07.5, 2:53.19.9.)

### C. The Board votes along party lines to recommend a redistricting map to the Georgia General Assembly

At the meeting on December 9, 2021, Tyson made a presentation regarding (primarily) the Chair's Map and answered questions by the board members. (*Id*., pp. 9-16.) After further debate and discussion, Davis moved to submit the *existing* map to the state LCRO, which was defeated

_____

[9] Doc. 194-35, pp. 21-22; Doc. 200-2, pp. 129:18-131:11; 180.

4-3 in a party-line vote. (*Id*., p. 17, at 3:19:33.6, 3:19:45.8.) Chairman Scamihorn then moved to submit the Chair's map to the state LCRO, which was approved by the same 4-3 party-line vote. (*Id*., pp. 17-18.)

### D.    The State enacts the District's recommended map

Because the State of Georgia has the exclusive power to enact new district maps, Tyson submitted the Chair's map to Gina Wright, the director of the Reapportionment Office, in early January 2022 for technical review. (Doc. 194-35, p. 17.) After Wright made minor technical corrections, the Chair's Map was drafted into the form of a bill, House Bill 1028. (Doc. 200-2, pp. 154:1-157:5.) The Georgia House approved House Bill 1028 on February 14, 2022, and the Georgia Senate approved it on February 28, 2022. (Doc. 194-1, p. 15). Governor Kemp signed HB 1028 into law on March 2, 2022. (*Id*.).

### E.    Appellees challenge the redistricted map

####    1.    Appellees name nominal parties only, causing the District to intervene

As stated above, Appellees filed this lawsuit on June 9, 2022, asserting a racial gerrymandering claim only, and against the Election Defendants only. (Docs 1, 37, ¶¶ 178-182.) The Election Defendants are nominal defendants, however, as they played no part in developing,

recommending, or enacting the map; indeed, the Election Defendants moved to dismiss the complaint because "[t]hey do not have any interest in either defending or challenging the constitutionality of the adopted maps." (Docs. 30-1 at 12; 43-1 at 14.) Indeed, Appellees did not attribute any racial motivation to the Election Defendants and instead alleged (in both their initial and amended complaints) that the *District* was motivated by race in redrawing the map that the General Assembly later enacted. (Doc. 1, ¶¶ 58 *ff*; Doc. 37, ¶¶ 70-85.)

Because the Election Defendants were not adequately protecting the District's interests, the District moved to intervene both as a matter of right and permissively. (Doc. 52.) Neither Appellees nor the Election Defendants opposed the Districts' claim to intervention as of right which was granted by the District Court "upon consent of the parties and for good cause shown." (Docs. 54, 55 and 60.)

2.   **The District finds Appellees could not sustain a claim against the District but does not decide the merits of their racial gerrymandering claim**

The District moved for judgment on the pleadings, asking the District Court to dismiss all claims against all defendants. (Doc. 83, p. 1; Doc. 98, p. 2; Doc. 137, pp. 5-7, 13-14, 43-45.) Primarily, the District

argued that Appellees' only potentially viable claim could be against the State because it held the exclusive power to enact the redistricted map. (Doc. 83 at 1-2, 4, 8-9, 12-19.)  Secondarily, the District contended that Appellees did not allege facts to support governmental entity liability under *Monell, supra,* against *any* party. *(*(Doc. 83*,* pp. 11-15; Doc. 98, pp. 2, 7-14.)

On July 18, 2023, the District Court issued an Order granting the District's motion on the second ground (*Monell*) only. (Doc. 136, pp. 33-34.) In the same order, the District Court denied the Election Defendants' motion to dismiss on standing grounds without addressing *Monell*'s requirements for Section 1983 liability against the Election Defendants. (*Id*., pp. 10-26.) Both the District and the Election Defendants immediately moved to dismiss the entire case based on the same *Monell* reasoning that the District Court applied to the District. (Docs. 148, pp. 10-14 and 149-1, pp. 10-11).

### 3.  **The District Court ousts the District as an intervenor**

Upon motion by Appellees, the District Court orally revoked the District's intervenor status, precluding it from participating further in the case during a September 12, 2023 telephone conference. (Doc. 182,

pp. 4-6.) The District Court memorialized the District's ouster on November 2, 2023, making clear that the District could not file anything in the case, respond to any motions or initiate any discovery. (Doc. 199, pp. 9-14.)[10]

4.    **The Election Defendants capitulate to an injunction against the redistricted map**

On October 13, 2023, the Election Defendants reached a settlement agreement with Appellees formalizing the terms of their surrender. (Doc. 190-1, p. 13.) The agreement forbids the Election Defendants from opposing an injunction against enforcing the redistricted map or taking an appeal. (*Id.*, p. 5.) Thereafter, Appellees filed their 55-page brief Motion for Preliminary Injunction on October 23, 2023.   (Doc. 194). Pursuant to the settlement agreement, The Election Defendants, did not file a response.

Upon the District's motion, it was allowed to file an amicus brief opposing Appellees' motion for an injunction, limited to 25 pages. (Docs. 193.) In its amicus brief, the District argued that: (1) Appellees' motion

---

[10] The District appealed its ouster to this Court in Appeal Nos. 23-13439 and 23-13764 which have been consolidated and are scheduled for oral argument on January 30, 2024.

for preliminary injunction was untimely because they had waited more than 19 months after Governor Kemp signed HB 1028 into law on March 2, 2022, and more than 16 months after they filed this lawsuit on June 9, 2022 (Doc. 201, 202, pp. 11-13); (2) Appellees failed to establish that the alleged motives of the Board or its map-drawer (Bryan Tyson) should be attributed to the legislature because it was the legislature, not the Board that adopted the redistricted map (*id.*, pp. 14-18); (3) Appellees failed to show that race rather than partisan considerations predominated Tyson's construction of Districts 2 and 6 (*id.*, p. 18-25); (4) Appellees failed to establish that District 3 was the product of unlawful racial gerrymandering because Tyson would have drawn a majority Black district even in the absence of the need to comply with Section 2 of the Voting Rights Act (*id.*, pp. 26-27); and (5) District 3 satisfies strict scrutiny because Tyson had good reason to believe that *retaining* a majority black district was necessary to comply with the Voting Rights Act. (*id.*, pp. 27-30.)

The District Court *completely ignored* all these arguments, not even acknowledging them in its December 14 Order.  (Doc. 212.)  Likewise, the District Court *completely ignored* and did not mention in its December 14

Order any of the evidence submitted by the District with its amicus brief, including the reports of its rebuttal experts. (*Id.*; Docs. 200-2 through 200-20.) Instead, the District Court relied on and repeatedly emphasized that the Board of Elections and its Director—the sham Defendants that Appellees named in this lawsuit—had not opposed or rebutted Appellees' contentions. (*See, e.g.*, Doc. 212, p. 1 ("*Because Plaintiffs' instant motion is unopposed by Defendants*, the facts that follow reflect Plaintiffs' representations and record evidence") (emphasis added); *id.*, p. 2 ("According to Plaintiffs – *whose account of the facts stands unrebutted by Defendants* – the Enacted Map was intentionally designed to 'manipulate[] the population of Cobb County predominately on the basis of race' so as to 'prevent the possibility' that voters of color might elect a majority of the seven (7)-member Cobb County School District Board." (emphasis added); *id.*, p. 9 ("The only remaining Defendants in this action – the Election Defendants – do not oppose Plaintiffs' PI motion."); *id.* p. 9 & n. 5 ("*The Parties* stipulated not to request a hearing on Plaintiffs' PI motion because *Defendants do not oppose the motion.*") (emphasis added); *id.*, p. 16 ("Plaintiffs contend – *and Defendants do not dispute* – that record evidence supports that race was the predominant factor used to

15

craft the Enacted Map in violation of legislative purpose.") (emphasis added); *id.*, p. 17 ("*The Parties do not dispute* that the Enacted Map (1) moved 'both Black and Latino voters' out of Districts 1, 4, 5, and 7 and (2) simultaneously increased the percentage of white voters in those same Districts.") (emphasis added); *id.*, p. 26 ("*Defendants offer no evidence to contradict that* VRA compliance was any more than a pretextual reason to justify the changes instituted by the Enacted Map.") (emphasis added); *id.* ("[Defendants] *do not show that they* 'had a strong basis in evidence for concluding that the [VRA] required' the challenged redistricting or otherwise 'establish that [*they*] had good reasons to think that [*they*] would transgress the [VRA] if [*they*] did not draw race-based lines.'") (emphasis added); *id*, p. 31 ("*noting the lack of opposition from Election Defendants*, the Court finds that Plaintiffs satisfy their burden to establish all four (4) elements of the preliminary injunction analysis").

Even though the District had disputed and opposed *all* these factual and legal conclusions (Doc. 202), the District Court ignored the District's evidence and legal arguments wholesale. (Doc. 212; Doc. 200-2 through Doc. 200-20). Without holding a hearing or evaluating the credibility of his live testimony, the District Court disregarded Tyson's sworn

testimony that partisan considerations rather than race were a substantial factor motivating his map-drawing.[11]

### F.    The District Court Sets An Impossible Deadline For Legislature To Adopt Remedial Map

To make matters worse, the District Court's December 14 Order gave the legislature until January 10, 2024, to adopt a remedial map, which is only ***two days*** after the regular legislative session would begin on January 8, 2024. (Doc. 212, p. 33; Ga. Const. Art. III, § 4, ¶ 1.) The District Court imposed this deadline based on the suggestion of the Appellees on September 22, 2023 – again without any opposing from the Election Defendants let alone input from the District. (Doc. 212., p. 33 (citing Doc. 180).) This two-day deadline was impossible because the House and Senate are governed by rules affecting the calendaring of bills moving through the House and Senate, including public notice for such hearings. A bill for adoption of a remedial map would need to be introduced in one chamber, be voted out of the appropriate committee after notice and hearing, be approved by that full chamber after a floor debate and then go through a similar process in the other chamber before

---

[11] Doc. 200-2, pp. 73:19-24; 112:10-17; 113:1-23; 115:19-24; 117:11-23; 146:11-16; Doc. 200-3, ¶¶ 2-10.

being presented to the Governor for signature. In this regard, for example, a bill may not pass out of the Georgia House for a minimum of two days after it is introduced. (*See* Georgia House Rules, Rules 48.1 through 48.3, filed in Appeal No. 23-13764, Doc. 31-4; Appeal No. 23-13439, Doc. 56-4.)

Apparently recognizing that the January 10 deadline was impossiblee, Appellees suggested that the deadline be extended by a mere 12 days to January 22, 2024. (Doc. 220), which the District Court quickly adopted. (Doc. 221.) After the January 22, 2024, the District Court states that it will consider any *"other proposed remedial maps"* submitted by January 24, 2024—only two days later—before itself adopting a remedial map by February 9, 2024. (Doc. 221, p.2.) In essence, therefore, the General Assembly was given only **two weeks** to adopt a remedial map, amidst numerous other priorities the State Legislature must address at the beginning of its 2024 session.

## III.  Standard of Review

Entry of a preliminary injunction is reviewed for an abuse of discretion. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 & n.13 (11th Cir. 2020).  Among other things, a district court abuses its discretion if

the ruling is based on an error of law or clearly erroneous findings of fact. *See*, *e.g.*, *Taveras v Bank of America, N.A.*, --- F.4ᵗʰ ---, 2024 WL 41219, at *3 (11th Cir. Jan. 4, 2024).

## SUMMARY OF THE ARGUMENT

At the outset, the District shows that it has standing to appeal either because it was improperly ousted as an intervenor or on equitable grounds based on Eleventh Circuit authority given its clear interest in the outcome of the litigation and its active participation in the case. See

Appellees obtained the preliminary injunction by first convincing the District Court to terminate the District's intervention rights and then entering into a "settlement agreement" with the nominal Election Defendants to forego any opposition or a right to appeal. The District Court then issued the injunction as unopposed while *completely ignoring all* the District's arguments and evidence in its amicus brief.

The preliminary injunction should be dissolved for several reasons. First, the motion was grossly untimely, as Appellees waited over 19 months after Governor Kemp signed HB 1028 into law and more than 16 months after they filed this lawsuit. As explained below, courts have denied motions for preliminary injunction based on far shorter delays.

Second, the District Court attributed the alleged motives of the District's map-drawer to the legislature even though he was retained by the District and not the legislature, thereby essentially adopting a "cat's paw" theory that has been rejected by the Supreme Court. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).

Third, the District Court ignored substantial evidence that political partisanship, and not race, was the predominant factor in redistricting the map without conducting a hearing to assess the credibility of Tyson who drew the map that the District recommended to the Legislature as well as evidence that conflicted with Appellees' contentions. This disregard is particularly troublesome given that a racial gerrymandering claim under the Equal Protection clause requires proof of invidious discrimination by the government adopting the map.

Fourth, in concluding that strict scrutiny was not satisfied, the District Court disregarded the evidence in the record and the arguments presented by the District showing that Tyson had good reason to believe that it was necessary to retain an existing and functioning majority Black district rather to dismantle it because of the absence of controlling case law on this issue.

20

Lastly, even if the injunction was authorized, the District Court has not given the General Assembly a "reasonable opportunity" to adopt a remedial map as required by the Supreme Court. Moreover, the District Court intends to put any map the Legislature enacts on par with "other proposed remedial maps" before deciding which map to adopt by February 9, 2023.

For these reasons, the District Court's preliminary injunction should be dissolved.

## ARGUMENT

To obtain a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless the injunction is granted; (3) the threatened injury outweighs the harm the injunction would cause to the non-moving party; and (4) the injunction would not be adverse to the public interest. *See*, *e.g.*, *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270-71 (11th Cir. 2020) (citing cases). A substantial likelihood of success on the merits is "generally the most important" requirement.  *Id*. at 1271 n.12 (citing cases).

Here the District Court abused its discretion in granting Appellees' motion for preliminary injunction for the reasons provided below.

## I.    The District has standing to appeal the preliminary injunction as an intervenor or on equitable grounds

The right to appeal is typically limited to parties, including intervenors. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-76 (1987). Because the District Court improperly terminated the District's intervention right, the District has an absolute right to appeal the adverse preliminary injunction. Separately, the District would have an "equitable" right to appeal because it "has a stake in the outcome of the proceedings that is discernible from the record" and "has participated in the proceedings before the district court." *Kimberly Regenesis, LLC,* 64 F.4th at 1261; *see also United States v. Under Seal*, 853 F.3d 706, 721 (4th Cir. 2017) ("a nonparty may appeal a district court's order or judgment when the appellant (1) possessed an interest in the case litigated before the district court and (2) participated in the proceedings actively enough to make it privy to the record.") On the record before the Court, the District has standing to appeal under either standard.

### A.    The District has Standing as an Intervenor

The District moved for intervention in the first place because Appellees had alleged that its board members were motivated by race in

recommending a redistricted map to the General Assembly to adopt. (Doc. 52.) Neither Appellees nor the Election Defendants opposed the District's motion which was granted by the District Court "for good cause shown." (Doc. 60.)

Apart from the litigation challenging the map that redrew the Cobb County's voting districts, the District was concerned that its interests were not being adequately protected. By way of example, the existing Election Defendants had moved to dismiss Appellees' complaint solely on procedural grounds as to whether they were proper parties but did not challenge the merits of the racial allegations, which were aimed squarely at the District. (Docs. 30 and 43.)[12]

Therefore, shortly after being granted intervention, the District moved for judgment as to the insufficiency of the allegations to support a racial gerrymandering claim under the Equal Protection Clause as a matter of law. (Docs. 83.) As the District made clear in its briefing and

---

[12] The Election Defendants proved the absence of adequate protection of the District's interests by advising the Court that "they want to remain above the fray. They do not want to get into the merits of these allegations about racial gerrymandering." (Doc. 137, pp. 15:24-16:1.) And of course the Election Defendants ultimately *abandoned* the District's interests altogether by agreeing not to oppose Appellees' motion for a preliminary injunction and to forego any right to appeal. (Doc. 190-1.)

at the hearing, the allegations were challenged as to the sufficiency to support an Equal Protection claim against *any* party and not just the District. (Docs. 98, p. 2) ("this case must be dismissed in its entirety"); Doc. 137, p. 14:15-16) ( "there's no basis here on the facts [alleged] for an equal protect claim. And if there is, it would be against the State.")

In ruling on the District's substantive motion, the District Court *agreed* that the allegations did not state a Section 1983 claim against a governmental entity such as the District. Based on *Monell*, the District Court concluded that "Plaintiffs fail to allege a 'pattern of similar constitutional violations,' as 'is ordinarily necessary' to state a § 1983 claim against a municipality…" (Doc. 136, p. 34.) On that basis, the District's motion was granted. (*Id.*)

The District Court, however, did not address the identical insufficiency of the allegations to support a Section 1983 claim against the Election Defendants who were on equal footing with the District in terms of being a governmental entity.[13] The absence of a "pattern of

---

[13] The Election Defendants are the Cobb County Board of Elections and Registrations—a governmental entity—and its Director in her "official capacity" which is a claim against the same governmental entity. See *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

similar constitutional violations" to support *Monell* liability against the District, therefore, would necessarily apply to the Election Defendants as well. For this reason, both the District and the Election Defendants moved the District Court to apply the same reasoning and dismiss the Election Defendants as well, as the District had requested in its motion for judgment on the pleadings. (Docs. 148 and 149.) The District Court denied the Election Defendants' motion because they had not separately raised that discrete ground in their motion to dismiss and denied the District's motion by ousting it from the case as an intervenor. (Doc. 199, pp. 5-8 and 14-15.)

Meanwhile, after the ruling on the District's motion for judgment on the pleadings, the District continued to be regarded as an intervenor, as it jointly filed a statement with Appellees asking the District Court for guidance on the scope of discovery that remained and joined a consent order to set a briefing schedule on the pending motions. (Docs. 140 and 154.) It was not until the District moved to exclude Appellees' experts that Appellees filed an "emergency motion" in the immediate aftermath to revoke the District's intervention status. (Docs. 155 and 156.) The District Court orally granted the Appellees' request during a conference

call that it thereafter memorialized in an order on November 2, 2023. (Docs. 182 and 199.)

The impropriety of the District's ouster as a defendant is the subject of Appeals No. 23-13439 and 23-13764 that have been consolidated by the Court and expedited, and for which oral argument is scheduled for January 30, 2024.[14] For the reasons advanced in the consolidated appeal, the District had an absolute right to remain in the case as an intervenor. As an intervenor, the District would have standing to appeal the adverse preliminary injunction issued by the District Court.

## B.    The District has Standing on Equitable Grounds

Even if the District had not appealed its ouster as an intervenor, it would have standing on equitable grounds. As outlined above, a nonparty may appeal an adverse appealable ruling on equitable grounds if it "has a stake in the outcome of the proceedings that is discernible from the record" and "has participated in the proceedings before the district court." *Kimberly Regenesis, LLC,* 64 F.4th at 1261. The District plainly has a "stake in the outcome" as the District Court has enjoined enforcement of the map of the county's voting districts that the District

---

[14] The District's motion to consolidate with the instant appeal was denied.

recommended the General Assembly adopt. Further, it has participated extensively in the proceedings in the District Court including serving subpoenas for third-party records, scheduling and conducting depositions, filing discovery and substantive motions, and ultimately opposing Appellees' motion for preliminary injunction in an amicus brief. Indeed, the record reflects that the District litigated the issues far more extensively than the Election Defendants who did not conduct a single deposition and ultimately surrendered to the relief Appellees sought by foregoing any opposition to the injunction or the ability to appeal. A greater equitable ground for allowing a nonparty to appeal would be difficult to envision.

## II. The District Court Abused its Discretion in Entering the Preliminary Injunction

### A. Appellees' motion was grossly untimely

A party must show that it exercised "reasonable diligence" in seeking a preliminary injunction including in election cases. *See*, *e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018); *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp.3d 1283, 1301 (N.D. Ga. 2020) (citing cases). The Eleventh Circuit and district courts have rejected requests for preliminary injunctions involving *far* shorter delays than those

27

present in this case. *See*, *e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (five-month delay); *Softwave Tissue Regeneration Technologies, LLC v. Kostopoulos*, 2022 WL 19976189, at *12 (N.D. Ga. 2022) (delay of two to four months) (citing cases); *Pals Group, Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (unexplained delays of a few months) (surveying cases).

Appellees demonstrated the *antithesis* of reasonable diligence in filing their motion more than **19 months** after Governor Kemp signed HB 1028 into law on March 2, 2022, and more than **16 months** after they filed this lawsuit on June 9, 2022.  Appellees did not cite *any* case that has granted a preliminary injunction after such a lengthy delay. Appellees claimed (first to counsel for the District and the Election Defendants, and then to the District Court) that they just discovered in the middle of August 2023 that a motion for preliminary injunction would be necessary to ensure a ruling in time for the 2024 election cycle because that is when they first learned that the primary was being scheduled for May 2024.  (Doc. 156-2, pp. 2-3 n.2; 6; Doc. 156-3, p.2; Doc. 156-4, p. 2; Doc. 156-6, p.,2).  Yet they delayed an additional two months before filing their motion. In any event,  the primary elections for the last *five* election

28

cycles have been in May, just as it will be for the 2024 election cycle. (Docs. 200-13, 200-14). The Court thus should reject as unreasonable this excuse offered by Appellees for their substantial delay in seeking a preliminary injunction.

Recognizing that their failure to anticipate that the primary elections would be scheduled for May 2024 is unreasonable, Appellees attempted to justify their delay by citing in their Motion to *In re Georgia Senate Bill 202*, 2023 WL 5334617, at *12 (N.D. Ga. Aug. 18, 2023) for the proposition that a motion for preliminary injunction may be filed too early to show imminent harm. (Doc. 194-1, p. 57.) However, the plaintiffs in that case re-filed their motions for preliminary injunction in April 2023, nearly *one year* before the primary elections for the 2024 election cycle, which the court held was appropriate. *In re Georgia Senate Bill 202*, 2023 WL 5334617, at *12. By contrast, Appellees here did not file their motion until six months later in relation to the same election cycle.

Because of Appellees' inexcusable delay, the District Court was rushed into (at the urging of Appellees) ruling on their motion by December 15, 2023. (Doc. 194-1, p. 59.) It did so by treating Appellees' Motion as unopposed and ignoring the arguments and evidence

29

presented by the District. (Doc. 212.) Appellees also claimed that a new remedial map needed to be in place by January 22, 2024, (Doc. 180, p. 3; Doc. 212, p. 27 n.10). Their apparent intent was to thwart appellate review of the erroneous preliminary injunction and prevent the legislature from adopting a remedial map so that the District Court would instead adopt a remedial map preferred by Appellees.  Because of Appellee's inexcusable delay, it was necessary for this Court to substantially accelerate briefing on this appeal to issue a timely ruling.

The District Court completely disregarded the fact that Appellees' motion was untimely and erred by not denying it on this basis alone.

### B.    Appellees did not show that Race was the "Predominant Factor" Motivating the General Assembly to Adopt the Map

A plaintiff asserting a racial gerrymandering claim must show that "race was the predominant factor motivating the *legislature's* decision to place a significant number of voters within or without a particular district."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995)(emphasis added); *see also Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248 (2022) (*per curiam*).  The Supreme Court has articulated the plaintiff's burden as follows:

> The plaintiff's burden is to show, either through circumstantial evidence *of a district's shape or size* or more direct evidence going to **legislative purpose**, that race was the predominant factor *motivating* the **legislature's** decision to place a significant number of voters within or without a particular district.  To make this showing, a plaintiff must prove that the **legislature** subordinated traditional, race-neutral districting principles, including, but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller*, 515 U.S. at 916 (emphases added).  The plaintiff must show that "race for its own sake, and not other districting principles, was the **legislature's** dominant and controlling rationale." *Id.* at 913 (emphasis added).

Courts must exercise "extraordinary caution in adjudicating claims that a [State] has drawn district lines on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 786, 797 (2017) (*quoting Miller*, 515 U.S. at 916).  This is because "[r]edistricting legislatures will, for example, almost always be aware of racial demographics, but it does *not* follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 916 (citing *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (emphasis added).

1.    **The District Court improperly adopted Appellees' "cat's paw" theory to impute racial motivation to the General Assembly**

Appellees' Motion focused almost exclusively on the alleged motives of the *Board* and its map-drawer, Tyson.  However, it is the motives of the Legislature, not the Board or Tyson, that matter because it was the Legislature, not the Board, that adopted the map as required under the Georgia Constitution. Ga. Const., Art. IX, § 2, ¶ I (c)(2).

Recognizing that the District merely recommended the redistricted map, Appellees essentially asserted a "cat's paw" theory in a futile attempt to attribute the Board's alleged racial motives or that of Tyson to the Legislature. "A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes.' A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for 'the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (internal citations omitted).

In *Brnovich,* the Supreme Court expressly rejected the application of the *"cat's paw"* theory in the legislative context, stating:

> The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists

> between an employer and a supervisor, but the legislators
> who vote to adopt a bill are not the agents of the bill's sponsor
> or proponents. Under our form of government, legislators
> have a duty to exercise their judgment and to represent their
> constituents. It is ***insulting*** to suggest that they are mere
> dupes or tools.

*Brnovich*, 141 S. Ct. at 2350 (emphasis added).

Just as legislators who adopt a bill are not the agents of a bill's sponsor, they are also not agents of a local board that recommended a bill to them.  Without discussion, the District Court erroneously treated Tyson as the Legislature's "cat's paw" and attributed his alleged motives to the Legislature even though he was retained by the Board and not the Legislature.  In doing so, the District Court disregarded the Supreme Court's admonition that legislatures are presumed to act in good faith, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018); *Miller*, 515 U.S. at 915. Thus, "[i]n assessing the sufficiency of a challenge to a districting plan," a court "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Brnovich*, 138 S. Ct. at 2324.

33

2. **The District Court ignored evidence of constitutional partisanship considerations that predominated the map-drawing**

Partisan gerrymandering does not violate the Fourteenth Amendment, and a claim of partisan gerrymandering is nonjusticiable. *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). When the government raises partisan motivations as a defense, the court faces a "formidable task." *Cooper,* 581 U.S. at 308. For example, the Supreme Court has acknowledged that "political and racial reasons are capable of yielding similar oddities in a district's boundaries" because "racial identification is highly correlated with political affiliation." *Id.* (quoting *Easley v. Cromartie* 532 U.S. 234, 243 (2001) ("*Cromartie II*")).

Thus, "[c]aution is especially appropriate … where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242. *See also Bush v. Vera*, 517 U.S. 952, 968 (1996) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify") (plurality opinion). Thus, a court "must make 'a sensitive inquiry' into all

34

'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 581 U.S. at 308 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

Here, the District Court held that race was the predominant factor in drawing all seven districts.  (Doc. 212, pp. 13-23.)  In doing so, the District Court completely disregarded the District's evidence showing that partisan considerations, not race, was the predominant factor—if not *the* factor—in the map-drawing process.

Notably, the District Court decided these issues without conducting a hearing to assess the credibility of Tyson or other witnesses even though a hearing is required where, as here, the "facts are bitterly contested and credibility determinations must be made to decide whether the injunctive relief should issue." *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003).  In this case, the District's evidence created disputed questions of fact necessitating credibility determinations regarding the testimony of Tyson and other witnesses regarding whether race or partisan considerations were the predominant motive.

35

For example, the District presented evidence that, following the direction of Andy Steinhauser, who Tyson understood to be speaking for Board Chairman Randy Scamihorn, Tyson drew the Chair's Map with the goal of retaining a Republican majority on the Board.[15] Tyson did so primarily by rotating the districts clockwise around the City of Marietta, which favored Republicans retaining their Board majority.[16]  Tyson analyzed political data reflecting precinct-level results from the general statewide elections in 2018 and 2020, as well as various county elections in 2018 and 2020, including for chair of the county commission and district attorney.[17]  Tyson used this political data to measure how the Republican Board members would likely perform in an election under various configurations of the map.[18]  Tyson reviewed the precinct-level political data with Steinhauser during the map-drawing process to ensure that the new proposed boundaries would increase the chances of

---

[15] Doc. 200-2, pp. 40:10-42:20; 113:10-17; 114:1-23: 116:19-24; 118:11-23; 147:11-16.

[16] Doc. 200-3, pp. 2-3, ¶¶ 7-8; Doc. 200-11, pp. 2:15-3:6; Doc. 200-5, p. 7:12-25; Doc. 200-7, pp. 15:24-16:2; 18:25-16:8.

[17] Doc. 200-2, pp. 36:3-6, 10-22; 38:20-23; 39:12-22, 81:19 – 82:15; Doc. 200-3, p. 3, ¶¶ 5-6; *Id.*, pp. 7-9).

[18] Doc. 200-2, pp. 82:10-15; 175.

retaining a Republican majority on the Board. (Doc. 200-3, p. 3 ¶¶ 5-6, and pp. 7-9.) Thus, the evidence of Tyson's partisan motives is even more compelling than in *Cromartie II*, where the Supreme Court held that the predominant motives of the North Carolina legislature were partisan and not racial. *Cromartie II*, 532 U.S. at 242-254.

Furthermore, Board member David Banks emailed Tyson on December 4, 2021, (four days before the Board recommended the Chair's Map) confirming that the goal of the Chair's Map was to ensure a Republican majority on the Board. (Doc. 200-12.) In addition, Tyson's *contemporaneous* notes on November 18, 2021, while in the middle of the map-drawing process, reflected his conversations with Steinhauser focusing on potential election outcomes and other political considerations.[19] For example, Tyson's notes of his 11/18/21 conversation with Steinhauser refers specifically to the political performance of Republican Board member David Chastain under a contemplated configuration of the proposed redistricted map. (Doc. 200-2, p. 175.) Tyson's 11/18/21 notes also refer to his conversation with Steinhauser about the use of political data, including from three generic races and two

---

[19] Doc. 200-2, pp. 175; 76:4–77:6; 81:24-82:15.

other races over two election cycles, and using this data as a baseline to measure the potential electoral performance of Republican Board members under various configurations of the proposed map.[20]

The District Court ignored the above-referenced evidence demonstrating that partisanship was the most important factor in the map-drawing process. Instead, the District Court cited to Tyson's deposition testimony that Districts 2 and 6 "could be viewed as [VRA-] compliant districts." (Doc. 212, p. 17.) The District Court, however, ignored Tyson's explanation that he did not draw Districts 2 or 6 based on race or to the comply with Section 2 of the VRA. (Doc. 200-2, p. 5, ¶ 10.) The District Court also disregarded Tyson's explanation that his deposition testimony simply reflected his understanding that others may view those districts as related to compliance with Section 2 because those districts would elect Democrats, who are currently the candidates of choice of Black and Latino voters in Cobb County. (*Id*.)

The District Court also relied heavily on the testimony of Appellees' expert, Anthony Fairfax, regarding the demographic and population changes set forth in the Chair's Map. (Doc. 212, pp. 18-22). However,

---

[20] Doc. 200-2, pp. 175; 81:24-82:15.

neither Fairfax nor Appellees' other expert even mentioned Tyson's stated partisan motives, much less attempted to explain how their data showed that Tyson's construction of the Chair's Map could only be explained because of race rather than politics.[21]  Nor did the District Court offer any such explanation.

Finally, in concluding that race was the predominant motive, the District Court relied on Tyson's testimony that he "looked at several ways to move" Board member David Chastain into District 4 without "compromis[ing] the political performance of Districts 1 and 7 in the process." (Doc. 212, p. 17.)  However, this testimony related to Tyson's discovery–very near the end of the map-drawing process–that Chastain's residence was just outside the district he represented (District 4).  (Doc. 200-2, pp. 127:13-128:6; 143:5-144:1.)  Obviously, a few last-minute changes hardly predominated the map-drawing process.  Regardless, the cited testimony reflects that politics (and incumbency protection), not race, was the predominant motive for these last-minute changes.

The District Court's complete disregard of the District's evidence showing a predominant partisan motive without at least holding a

---

[21] Doc. 194-1, pp. 25-29; Docs. 194-3, 194-4.

hearing is especially problematic under the circumstances of this case. The District requested permission to file an amicus brief for the explicit purpose of providing evidence and argument in opposition to Appellees' anticipated Motion for Preliminary Injunction, when it was well known that the Election Defendants would not be opposing Appellees' Motion. (Doc. 190). The District Court granted leave without limiting the District's right to present evidence. (Doc. 60.) Thus, the District Court improperly invalidated a democratically enacted redistricting map for the third most populous county in Georgia[22] by treating Appellees' Motion as unopposed and ignoring the District's evidence and arguments demonstrating that race was not the predominant motive for the redistricting map.

### C.  The District Court erred in concluding that District 3 was the product of unlawful racial gerrymandering

1. **The District Court ignored Tyson's testimony that he would have drawn the same or substantially the same majority-black district without the need to comply with the VRA**

---

[22]  See  https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html (last visited January 16, 2024).

40

The "central purpose" of the Fourteenth Amendment is to "prevent the States from purposefully discriminating between individuals because on the basis of race." *Shaw*, 509 U.S. at 642. Thus, racial gerrymandering is simply a particular form of intentional race discrimination. *See*, *e.g., id*. at 649; *Miller*, 515 U.S. at 913. A racial gerrymandering claim, like any other intentional race discrimination claim, may be defeated by showing that the same decision would have been made without the racial motive. *See, e.g., Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 271 n. 21 (1977); *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Here, Tyson testified that he would have made the same decision to maintain the same or substantially the same majority Black district in South/Southwest Cobb County even if he had not concluded that it was necessary to do so to comply with § 2 of the VRA. (Doc. 200-3, p. 5, ¶ 11.) Tyson would have done so (1) to achieve the partisan goal of ensuring a Republican majority on the Board and also to apply traditional redistricting criteria and to carry out Chairman Scamihorn's other redistricting criteria; and (2) because drawing a majority-black district in this area was almost inevitable due to the heavy density of Black

voters in this area of the County.[23]

Retaining a majority-black district in South/Southwest Cobb County for reasons unrelated to § 2 VRA compliance would be lawful. As the Supreme Court explained in *Shaw*,

> [W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. **The district lines may be drawn, for example, to provide for compact districts of contiguous territory**, or to maintain the integrity of political subdivisions.

*Shaw*, 509 U.S. at 646 (citing cases) (emphasis added). The District Court, however, ignored this evidence and argument in its December 14 Order. (Doc. 212, pp. 23-27.)

> **2.    The District Court erred in concluding that District 3 would not satisfy strict scrutiny despite Tyson's good reason to believe that retaining a majority Black district was necessary to comply with the VRA**

The Supreme Court repeatedly has assumed (without expressly holding) that compliance with the VRA constitutes a compelling state interest that might permit consideration of race in the redistricting

---

[23] *Id.*; Doc. 200-1, pp. 94:25–95:8; 95:21-96:4; Doc. 200-4, pp. 42-44, ¶¶ 105-106.

process, and then considered whether the government's actions were narrowly tailored to advance that compelling interest under strict scrutiny. *See*, *e.g.*, *Wisconsin Legislature*, 142 S. Ct. at 1248; *Cooper*, 581 U.S. at 292; *Bethune-Hill*, 137 S. Ct. at 801; *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (*Shaw II*); *Miller*, 515 U.S. at 921. In this context, the narrow tailoring requirement "insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015); *Cooper*, 581 U.S. at 292-93; *Shaw*, 509 U.S. at 656.  This standard:

> [d]oes not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid … And legislators "may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have *good reasons* to believe such use is required, even if a court does not find that the actions were necessary for statutory compliance."

*Alabama Legislative Black Caucus*, 575 U.S. at 278. (citation omitted) (emphasis in original). This standard gives local governments "'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 293. Thus, "[i]f a State has good reason to think that all the '*Gingles*

43

preconditions'[24] are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district." *Cooper,* 581 U.S. at 302.

The District Court concluded that the third *Gingles* factor was not satisfied because Tyson did not conduct a "functional analysis" of voter behavior in District 3. (Doc. 212, pp. 25-26.)   However, the District Court ignored the fact that Tyson did not *create* a new majority black district; he *retained* the majority Black District 3 that existed since at least 2012. In fact, Tyson retained 87.36% of pre-existing District 3. (Doc. 200-4, ¶ 66) and *reduced* the percentage of Black voters in District 3 from 56.78% to 56.24% and the percentage of Hispanic voters in District 3 from 16.94% to 16.89%. (*Id.*, ¶¶ 39, 48.)

The District Court failed to cite *any* authority for the proposition that an *existing* majority Black district that is functioning as designed

---

[24] To make a threshold showing of voter dilution under § 2 of the VRA, a plaintiff must show (1) a "minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) a district's white majority must "vote[] sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed – usually to defeat the minority's preferred candidate." *Thornburgh v. Gingles*, 478 U.S. 30, 50-51 (1986) (citation omitted).

must be dismantled if a "functional analysis" is not conducted.   Nor did the District Court cite *any* case holding that a jurisdiction may dismantle an *existing* and functioning majority Black district without violating § 2 of the VRA if candidates preferred by Black voters in that district win by a certain percentage for a certain period of time.  The Supreme Court racial gerrymandering cases that have rejected a VRA § 2 compliance defense have done so where the government sought to *add* a majority-minority district and was unable to show that it had good reason to believe that one was necessary under the VRA. *See*, *e.g.*, *Wisconsin Legislature*, 142 S. Ct. at 1249 (state sought to add seventh majority-minority district); *Abbott*, 138 S. Ct. at 2332-35 (state sought to add majority Latino districts); *Cooper*, 581 U.S. at 301-304 (state sought to create majority Black district); *Shaw II*, 517 U.S. at 914-18 (state sought to add majority Black congressional district).

Accordingly, Tyson had good reason to believe that, in the absence of controlling case law holding that the existing and functioning majority Black district in District 3 could be dismantled without violating § 2 of the VRA, the District would face a significant threat of § 2 VRA liability if it dismantled the majority Black district in District 3. (Doc. 200-2, p.

45

96:12-17.)[25] Even if subsequent case law develops holding that an existing majority-minority district may be dismantled without violating § 2 of the VRA under certain circumstances, Tyson still had good reason to believe that the District was required under § 2 of the VRA to retain the existing majority Black district in District 3.

### III. The District Court abused its discretion by failing to provide a "reasonable opportunity" for the Legislature to redraw the map

The Supreme Court has repeatedly recognized that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (citing cases). "When a federal court declares an existing apportionment scheme unconstitutional, it is

---

[25] Tyson's concerns about VRA liability if the District dismantled a functioning majority Black district were prescient. In *Pettaway v. Galveston County*, --- F.Supp.3d ---, 2023 WL 6786025, at *42-53 (S.D. Texas Oct. 13, 2023), for example, the court held that the county violated § 2 of the VRA when it dismantled an existing majority-minority district. On appeal, a panel of the Fifth Circuit affirmed the district court's holding that a coalition of different minority groups may be aggregated for purposes of a § 2 VRA claim, but the Fifth Circuit is considering this issue anew *en banc. Pettaway v. Galveston County*, 86 F.4th 214 (5th Cir. 2023), *vacated and rehearing en banc granted*, 86 F.4th 1146 (5th Cir. 2023). In the meantime, the en banc Fifth Circuit has stayed the district court's order pending the outcome of the appeal. *Pettaway v. Galveston County*, 87 F.4th 721 (5th Cir. 2023).

therefore, appropriate, whenever practicable, to afford a *reasonable* opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id*. at 540 (emphasis added); *accord Whitest v. Crisp County School District*, 2023 WL 8627498, at *2 (11th Cir. Dec. 13, 2023) (explaining that district courts should "afford a reasonable opportunity for the legislature to meet constitutional requirements") (quoting *Wise*, 437 U.S. at 540).

In this case, the District Court initially imposed an arbitrary and unreasonable January 10, 2024 deadline on the legislature to enact a remedial map – **two days** after the opening of the legislature's regular session on January 8, 2024 – solely at the suggestion of Appellees. (Doc. 212, p. 33) (citing Doc. 180).  Ga.Const. art. III, § 4, ¶ 1.  That impossible deadline thwarted the legislature's ability to comply.  The two-day deadline imposed by the District Court in its December 14 Order did not give the legislature a *reasonable* opportunity to enact a remedial map.

Nor does the District Court's revised deadline of January 22, 2024, cure the problem. As Appellees are undoubtedly aware, the Georgia General Assembly does not meet for 40 continuous calendar days. Rather,

47

the constitutionally mandated 40 legislative days are spread out over approximately three months, generally completing a legislative session in late March or early April of every year. A legislative day requires one or both of the chambers of the legislature to convene for floor debate and voting on bills. The current session, while in its ninth calendar day has only convened five legislative days.

The General Assembly will be out of session the week of January 15 for various committee hearings to work on legislative priorities, including the State budget, which it has a constitutional duty to adopt during its 40-legislative day session. Ga. Const. art. III, § 9, ¶ II(b); Ga. Const. art. III, § 4, ¶ I.  https://www.legis.ga.gov/schedule/all.[26] Thus, the General Assembly will not even be in session again until January 22.[27]

---

[26] During a legislative session, the General Assembly frequently exercises its authority to adjourn for weekends and in this instance, for a week. Ga. Const. art. III, § 4, ¶ I.  Thus, the General Assembly's 40-day legislative session typically does not end until late March or the first week of April.

[27] Nevertheless, the legislature is working as quickly as possible to adopt a remedial map.  A proposed remedial map was introduced in the state Senate on the opening day of the session by Sen. Setzler on January 8, received the requisite readings, was referred to the appropriate committee, which held a hearing and approved it on January 12, 2024. https://www.legis.ga.gov/legislation/65953; https://vimeo.com/showcase/gasenslgo.

https://www.legis.ga.gov/schedule/all?start=1-22-2024&end=1-26-2024.    That

date (January 22) while the fourteenth calendar day of the session will

only be the sixth legislative day of the session. Clearly, even the

"extended" deadline is just as unreasonable as the initial January 10

deadline.

Furthermore, the arbitrary and unreasonable January 22 deadline

(again suggested by Appellees) is wholly unnecessary, as the Election

Defendants previously have indicated that they have implemented a new

county-wide map in as little as four weeks,[28] and possibly could be even

shorter under a new voter registration system.[29]

Even if the General Assembly were to enact a remedial map into

law by January 22, 2024, the District Court has indicated that it will

consider objections to that map *and "other proposed remedial maps"*

submitted by January 24, 2024—only two days later—before itself

adopting a remedial map by February 9, 2024. (Doc. 221.) The District

Court's intent, therefore, is to view a law—*if enacted within a truncated*

---

[28] Doc. 156-4, p. 3 n.5; Doc. 156-6, p. 3 n.5; Doc. 156-9; Doc. 156-10, p. 5; Doc. 156-11, p. 2.

[29] Doc. 156-11, pp. 2-3.

*period*—on par with other proposed maps in determining which one to adopt. This procedure is far removed from the "reasonable opportunity" required by Supreme Court law. Moreover, the procedure should be for the Legislature's map to be in force unless intentional discrimination is shown to support a racial gerrymandering claim.

## CONCLUSION

For these reasons, the Preliminary Injunction should be dissolved, and the case should be remanded for further proceedings.

<u>*/s/ Philip W. Savrin*</u>
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com
William H. Buechner, Jr.
Georgia Bar No. 086392
bbuechner@fmglaw.com
P. Michael Freed
Georgia Bar No. 061128
michael.freed@fmglaw.com

*Attorneys for Cobb County School District*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(833) 330-3669 (facsimile)

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by 11th Cir. R. 32-4 this document contains 9,053 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: January 16, 2024.

*/s/ Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically submitted the foregoing Intervenor-Appellant Cobb County School District's **BRIEF OF INTERVENOR-APPELLANT COBB COUNTY SCHOOL DISTRICT** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants.

Dated: January 16, 2024.

*/s/Philip W. Savrin*
Philip W. Savrin
Georgia Bar No. 627836
psavrin@fmglaw.com