Docket No. 23-14186-B

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

Karen Finn, *et al.*,

*Plaintiffs-Appellees*,

v.

Cobb County Board of Elections and Registration, *et al.*,

*Defendants-Appellees*,

and

Cobb County School District,

*Appellant*.

---

On appeal from the United States District Court for the Northern District of Georgia; Civil Action No. 1:22-CV-02300-ELR

---

## PLAINTIFFS-APPELLEES' BRIEF

---

Bradley E. Heard (Ga. Bar No. 342209)
Pichaya Poy Winichakul (Ga. Bar No. 246858)
Michael Tafelski (Ga. Bar No. 507007)
Sabrina S. Khan*
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
(404) 521-6700
bradley.heard@splcenter.org
poy.winichakul@splcenter.org
michael.tafelski@splcenter.org
sabrina.khan@splcenter.org

Jeff Loperfido
Christopher Shenton
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
5517 Durham Chapel Hill Blvd Durham, NC 27707
(919) 323-3380
jeffloperfido@scsj.org
chrisshenton@scsj.org

Caitlin May (Ga. Bar No. 602081)
Cory Isaacson (Ga. Bar No. 983797)
**ACLU FOUNDATION OF GEORGIA, INC.**
P.O. Box 570738
Atlanta, Georgia 30357
(678) 310-3699
cmay@acluga.org
cisaacson@acluga.org

Jon Greenbaum
Ezra D. Rosenberg
Julie M. Houk
Sofia Fernandez Gold

Heather Szilagyi
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
sfgold@lawyerscommittee.org
hszilagyi@lawyerscommittee.org

Douglas I. Koff**
Thomas L. Mott**
Jacqueline Maero Blaskowski**
Paul Schochet**
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
(212) 756-2000
Douglas.Koff@srz.com
Thomas.Mott@srz.com
Jacqueline.MaeroBlaskowski@srz.com
Paul.Schochet@srz.com

 *Admitted Pro Hac Vice*
 **Admissions to the 11th Circuit Pending*

*Counsel for Plaintiffs Karen Finn, Dr. Jillian
Ford, Hylah Daly, Jenne Dulcio, GALEO Latino
Community Development Fund, Inc., New
Georgia Project Action Fund, League of Women
Voters of Marietta-Cobb, and Georgia Coalition
For The People's Agenda, Inc.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees certify that the following is a complete list of all interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. America Civil Liberties Union Foundation of Georgia, Inc. – *Counsel for Plaintiffs-Appellees*

2. Anderson, Scott Eric – *Counsel for Appellant*

3. Buechner, William H. – *Counsel for Appellant*

4. Cobb County Board of Elections and Registration – *Defendant*

5. Cobb County School District – *Appellant*

6. Crumley, Jonathan Dean – *Counsel for Appellant*

7. Daly, Hylah – *Plaintiff-Appellee*

8. Davis, Javon – *Counsel for Plaintiffs*

9. Dulcio, Jenne – *Plaintiff-Appellee*

10. Eveler, Janine – *Defendant, in her official capacity as Director of the Cobb County Board of Elections and Registration, substituted November 2, 2023*

11. Finn, Karen – *Plaintiff-Appellee*

12. Ford, Jillian – *Plaintiff-Appellee*

13. Freed, P. Michael – *Counsel for Appellant*

14. Freeman Mathis & Gary LLP – *Counsel for Appellant*

15. GALEO Latino Community Development Fund, Inc. – *Plaintiff-Appellee*

16. Georgia Coalition for the People's Agenda, Inc. – *Plaintiff-Appellee*

17. Gold, Sofia Fernandez – *Counsel for Plaintiffs-Appellees*

18. Greenbaum, Jon M. – *Counsel for Plaintiffs-Appellees*

19. Haynie, Litchfield & White, PC – *Counsel for Defendant*

20. Heard, Bradley E – *Counsel for Plaintiffs-Appellees*

21. Houk, Julie Marie – *Counsel for Plaintiffs-Appellees*

22. Isaacson, Cory – *Counsel for Plaintiffs-Appellees*

23. Khan, Sabrina S. – *Counsel for Plaintiffs-Appellees*

24. Koff, Douglas I. – *Counsel for Plaintiffs-Appellees*

25. Lawyers' Committee for Civil Rights Under Law – *Counsel for Plaintiffs-Appellees*

26. League of Women Voters of Marietta-Cobb – *Plaintiff-Appellee*

27. Loperfido, Jeffrey – *Counsel for Plaintiffs-Appellees*

28. Maero Blaskowski, Jacqueline – *Counsel for Plaintiffs-Appellees*

29. May, Caitlin Felt – *Counsel for Plaintiffs-Appellees*

30. Miller, Gerry – *Defendant, in his official capacity as Interim Director of the Cobb County Board of Elections and Registration*

31. Mott, Thomas Livingstone – *Counsel for Plaintiffs-Appellees*

32. New Georgia Project Action Fund – *Plaintiff-Appellee*

33. O'Donnell, Courtney – *Counsel for Plaintiffs-Appellees*

34. Price, Savannah Rose – *Counsel for Plaintiffs-Appellees*

35. Rosenberg, Ezra D. – *Counsel for Plaintiffs-Appellees*

36. Ross, Honorable Eleanor L. – *United States District Judge*

37. Savrin, Philip Wade – *Counsel for Appellant*

38. Schulte Roth & Zabel, LLP – *Counsel for Plaintiffs-Appellees*

39. Shenton, Chris – *Counsel for Plaintiffs-Appellees*

40. Short, Caren – *Counsel for Plaintiffs-Appellees*

41. Southern Coalition for Social Justice – *Counsel for Plaintiffs-Appellees*

42. Southern Poverty Law Center – *Counsel for Plaintiffs-Appellees*

43. Szilagyi, Heather Jean – *Counsel for Plaintiffs-Appellees*

C-3

44. Tafelski, Michael Joseph – *Counsel for Plaintiffs-Appellees*

45. White, Daniel Walter – *Counsel for Defendants*

46. Winichakul, Pichaya Poy – *Counsel for Plaintiffs-Appellees*


I hereby certify that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: January 18, 2024

Respectfully submitted,

*/s/ Michael Tafelski*
Michael Tafelski

*Counsel for Plaintiffs*

## STATEMENT REGARDING ORAL ARGUMENT

In the interest of conserving judicial and party resources, Plaintiffs believe oral argument is unnecessary. The issues on appeal here—including the threshold jurisdictional issue that a nonparty has no standing to appeal and the routine application of the abuse of discretion standard regarding the grant of a preliminary injunction—are not novel questions that merit oral argument.

## TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................5

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE.................................................................2

I.    Factual Background. ..............................................................5

II.   Procedural History. ...............................................................9

STANDARD OF REVIEW ...............................................................16

SUMMARY OF ARGUMENT.............................................................17

ARGUMENT ...............................................................................19

I.    This Court Does Not Have Jurisdiction Over an Appeal Made by a Nonparty. 19

    A.  CCSD Is Not a Party and Lacks Standing to Appeal the PI Order..............19

    B.  The Narrow Exceptions to the Requirement for the Rule That Only Parties May Appeal Do Not Apply to CCSD. ........................................................22

II.   If This Court Reaches the Merits of This Appeal, It Should Affirm the Issuance of the Preliminary Injunction. ...................................................29

    A.  The PI Motion Was Timely..........................................................32

    B.  The District Court Properly Weighed the Evidence in Determining Race Predominated the Map-drawing Process. ...................................................33

        1.   CCSD's Cat's Paw Argument Is a Red Herring............................34

        2.   CCSD's Partisanship Explanations Are Contradicted by the Record. .................................................................................36

i

i.      The Overwhelming Weight of the Contemporaneous Record
        Evidence Negates Any Claim of Partisan Gerrymandering..............36

ii.     CCSD's So-Called Contemporaneous Evidence Consists of Only
        Two Mischaracterized Emails. ...........................................39

iii.    Nothing Offered by CCSD Outweighs Mr. Tyson's Own Testimony
        That Race Predominated the Map-Drawing.....................................40

C.  The District Court Did Not Err When It Determined That the Use of Race
    in the Map-Drawing Process Failed Strict Scrutiny. ...................................41

    1.      CCSD Confuses Standards in Relying on Irrelevant Post-hoc
            Explanations for the Enjoined Plan....................................42

    2.      CCSD Ignores the "Good Reason" Requirement in Arguing That
            VRA Compliance Justified Its Actions. ...........................................45

    3.      CCSD Fails to Demonstrate That VRA Compliance Motivated the
            Race-Based Redistricting. ...............................................46

III.    The District Court Did Not Abuse Its Discretion in Providing the Georgia
General Assembly With 36 Days to Pass a Remedial Map. ...................................47

CONCLUSION ......................................................................51

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018).......................................................................31

*Abeyta v. City of Albuquerque*,
    664 F.3d 792 (10th Cir. 2011) .............................................................29

*Ala. Legis. Black Caucus v. Alabama*,
    575 U.S. 254 (2015) ...........................................................31, 41, 44

*Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole Cnty., Fla.*,
    468 F. App'x 922 (11th Cir. 2012)......................................................17

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission*
  *Servs., LLC*,
    425 F.3d 964, 968 (11th Cir. 2005) ...........................................16, 17

*Benisek v. Lamone*,
    138 S. Ct. 1942, 1944 (2018) ......................................................32, 33

*Bethune-Hill v. Va. State Bd. Of Elections*,
    580 U.S. 178 (2017)..........................................................30, 31, 41

*Black Voters Matter Fund v. Raffensperger*,
    508 F. Supp. 3d 1283 (N.D. Ga. 2020) .............................................33

*Brnovich v. Democratic National Committee*,
    141 S. Ct. 2321 (2021) .......................................................................34

*CalMat Co. v. Oldcastle Precast, Inc.*,
    771 F. App'x 866 (10th Cir. 2019) ...................................................26

*Calvin v. Jefferson Cnty. Bd. of Comm'rs*,
    172 F. Supp. 3d 1292 (N.D. Fla. 2016)..............................................49

*Casey v. Clayton County*,
    2007 WL 788943 (N.D. Ga. Mar. 14, 2007)......................................10

iii

*Chavez v. Credit Nation Auto Sales, Inc.*,
No. 1:13-CV-00312-WSD-JCF, 2014 WL 12780146 (N.D. Ga.
June 5, 2014)................................................................................33

*Clark v. Putnam Cnty.*,
293 F.3d 1261 (11th Cir. 2002).................................................43, 44

*Cooper v. Harris*,
581 U.S. 285 (2017)................................................................*passim*

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017).......................47

*Davis v. Chiles*,
139 F.3d 1414 (11th Cir. 1998)........................................................34

*Dopp v. HTP Corp.*,
947 F.2d 506 (1st Cir. 1991) ...............................................24, 25, 26

*Easley v. Cromartie*,
532 U.S. 234 (2001)..................................................................37, 38

*In re Georgia Senate Bill 202*,
No. 1:21-CV-01229-JPB, 2023 WL 5334617 (N.D. Ga. Aug. 18,
2023) ........................................................................................33

*Golden Gate Rest. Ass'n v. City & Cnty of S.F.*,
546 F.3d 639 (9th Cir. 2008)........................................................33, 34

*Gonzalez v. Governor of Georgia*,
978 F.3d 1266 (11th Cir. 2020)....................................................16, 30

*Harris v. McCrory*,
159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper*,
581 U.S. 285 (2017)............................................................30, 38, 49

*Hilao v. Est. of Marcos*,
393 F.3d 987 (9th Cir. 2004)..........................................................22

iv

*Hispanic Soc'y of New York City Police Dep't v. New York City Police Dep't*,
  806 F.2d 1147 (2d Cir. 1986) ............................................................27

*Jacksonville Branch of NAACP v. City of Jacksonville*,
  635 F. Supp. 3d 1229 (M.D. Fla. 2022) ...........................................32

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ................................................11, 21, 25

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ....................................................29, 30

*Kimberly Regenesis, LLC v. Lee Cnty.*,
  64 F.4th 1253 (11th Cir. 2023) .....................................................22, 23

*Larios v. Cox*,
  300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) .................49

*LaTele Television, C.A. v. Telemundo Commc'ns Grp., LLC*,
  9 F.4th 1349 (11th Cir. 2021) ............................................................16

*Marino v. Ortiz*,
  484 U.S. 301 (1988).......................................................1, 20, 27, 28

*Microsystems Software, Inc. v. Scandinavia Online AB*,
  226 F.3d 35 (1st Cir. 2000) ........................................................23, 27, 29

*Miller v. Johnson*,
  515 U.S. 900 (1995).......................................................30, 41, 42

*Monell v. Dep't of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978).......................................................10, 11

*Navajo Nation v. San Juan Cty.*,
  929 F.3d 1270 (10th Cir. 2019).......................................................43

*Petteway v. Galveston County*,
  --- F.Supp.3d ---, 2023 U.S. Dist. LEXIS 183978 (S.D. Texas Oct. 13, 2023) ....................................................47

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1223 (11th Cir. 2005) ...................................................17, 18

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ...................................................................43

*Shaw v. Reno*,
    509 U.S. 630 (1993) ...................................................................42

*Sky Cable, LLC v. DIRECTV, Inc.*,
    886 F.3d 375 (4th Cir. 2018) ...................................................22, 24

*State Farm Ins. Co. v. Carapella (In re Gaime)*,
    17 F.4th 1349 (11th Cir. 2021) ...................................................25, 29

*Stout v. Jefferson Cty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) ...................................................35

*Taylor v. Appleton*,
    30 F.3d 1365 (11th Cir. 1994) ...................................................19

*Texas Brine Co., LLC & Occidental Chem. Corp.*,
    879 F.3d 1224 (10th Cir. 2018) ...................................................29

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ...................................................................5, 41

*Toronto-Dominion Bank v. Cent. Nat'l Bank & Tr. Co.*,
    753 F.2d 66 (8th Cir. 1985) ...................................................21

*United States v. Carter*,
    995 F.3d 1214 (10th Cir. 2021) ...................................................22

*United States v. State of Mich.*,
    940 F.2d 143 (6th Cir. 1991) ...................................................24

*Verizon Md. Inc. v. PSC*,
    535 U.S. 635 (2002) ...................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................42

vi

*Wisconsin Legislature v. Wisconsin Elections Comm'n*,
  595 U.S. 398 (2022) .................................................................35, 43

*Wise v. Lipscomb*,
  437 U.S. 535 (1978) .................................................................50

*Wolff v. Cash 4 Titles*,
  351 F.3d 1348 (11th Cir. 2003) ...............................................19, 20

*Wyatt By & Through Rawlins v. Hanan*,
  868 F. Supp. 1356 (M.D. Ala. 1994) ........................................24

**Statutes and Rules**

15A Fed. Prac. & Proc. Juris. § 3902.3 (3d ed.) ..............................23, 24

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 1343 ............................................................................1

Ga. H.B. 1028 ...............................................................................9

O.C.G.A. § 28-1-14.1(b)(1) ...........................................................8

**Consititutions**

Ga. Const. art V. § II, para VII ....................................................49

U.S. Const. amend. XIV ...............................................................2, 9, 30

**Other Authorities**

Georgia House, Committee on Governmental Affairs (Feb. 9, 2022),
  at 0:38:25–0:42:46,
  https://vimeo.com/showcase/8988922?video=675573182 ..................9

Georgia House, Committee on Governmental Affairs (Feb. 9, 2022)
  Tr. 3-4 (unofficial transcript) ...............................................9

Petition,
*In re: Cobb County School District*,
  No. 23-13185 (11th Cir. 2023), Doc. 1 ....................................12, 13

vii

Petition,
*In re: Cobb County School District*,
    No. 23-13185 (11th Cir. 2023), Doc. 5 ...............................................13

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Georgia had original subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343. This Court lacks jurisdiction over this appeal because, as a result of its own request for dismissal, Appellant Cobb County School District ("CCSD") was not a party to the action at the time the district court issued its order granting Plaintiffs' Motion for Preliminary Injunction ("PI Order"). (ECF 212.)[1] The Supreme Court has explained that "[t]he rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988). CCSD has not established any reason it meets an exception to this well-settled rule.

## STATEMENT OF THE ISSUES

1. Whether CCSD, a former defendant by way of intervention and current nonparty *amicus curiae*, has standing to appeal the grant of a preliminary injunction after the district court previously entered judgment in its favor and terminated it as a party.

---

[1] Citations to "Dkt." refer to the docket for this third appeal, 23-14186. Citations to "Doc." refer to the docket for CCSD's first appeal, 23-13439, which has been consolidated with its second appeal, 23-13764. Citations to "ECF" refer to the district court's docket for the underlying action.

1

2. Whether the district court abused its discretion in granting Plaintiffs' Motion for Preliminary Injunction on December 14, 2023.

3. Whether the district court abused its discretion in setting out a remedial schedule that provided the Georgia General Assembly with 36 days to enact a remedial map.

## STATEMENT OF THE CASE

This appeal stems from a racial gerrymandering action that challenges voting districts for the Cobb County School Board ("Board") in Cobb County, Georgia. Plaintiffs—Cobb County voters, parents of students, educators, former students of Cobb County Schools, and non-partisan voting rights organizations active in Cobb County—have demonstrated, through direct and circumstantial evidence, that the Board's map (the "Enjoined Plan") is a racial gerrymander, in violation of the Fourteenth Amendment.

The present appeal, CCSD's third in as many months, is brought by an entity, who, having been dismissed from the proceedings below on its own request, now seeks to directly attack an injunction issued in those proceedings. For the reasons set forth herein, the appeal fails procedurally, legally, factually, and equitably, and should be rebuffed accordingly.

In single-minded pursuit of its sole goal—the frustration of a proper and timely resolution of this litigation—CCSD has made a series of inconsistent strategic

decisions, resulting in irreconcilable positions, before both this Court and in the district court below. It demanded entry into the case below as a defendant, and, after having been granted such status, then moved to have the claims dismissed against it on the ground that it was not a proper party to the suit. Having obtained its desired dismissal from the case, it then proceeded to act as if it were still a party to the case. Instead of immediately filing a renewed motion to intervene in the case, CCSD continued to challenge the dismissal necessarily resulting from the district court's grant of CCSD's judgment on the pleadings, and inaccurately characterized its own desired dismissal as a denial of a motion to intervene that had never been filed in order to manufacture a colorable basis for filing an interlocutory appeal. And now, having been granted amicus status before the district court issued the PI Order, it seeks to appeal the PI Order as if it is still a party to the litigation below, which it is decidedly not.

CCSD has also stretched procedural rules to the breaking point throughout the litigation, both in the district court and on appeal. It appealed an order that it requested, and that was granted on its own motion. It purported to participate in the district court as an "Adverse Intervenor" after winning its motion for judgment on the pleadings, a litigation status heretofore unrecognized by any court the district court could find. It has *directly* subpoenaed Plaintiffs' litigation counsel for their "entire file" concerning this case. (ECF 102 at 6 n.2.) And, in a flurry of duplicative

motions and briefs filed in this Court, it has filed both a reply brief that was out of time and a third stay motion that exceeded this Court's word limit.

On the merits relating to the district court's issuance of the PI Order, CCSD has also mischaracterized the testimony of its own witnesses and the positions of Plaintiffs. CCSD has repeatedly asserted certain justifications for its map-drawing, including partisanship, that were expressly disclaimed by the Board members who voted in favor of the Enjoined Plan. It has steadfastly asserted that Section 2 of the Voting Rights Act ("VRA") justifies the map-drawing, but also that it is of no import that the Section 2 preconditions were not established, or even studied. It has repeatedly claimed that notes from the map-drawer stand as irrefutable explanations for certain facts—despite the map-drawer himself testifying that he did not remember what those notes meant. It has argued that "extensive" and "contemporaneous" evidence supports its characterization of the record, despite also conceding that this contemporaneous evidence amounts to "*two* [] emails." (Doc. 65 at 5 (emphasis in original)). It has also claimed that Plaintiffs' "*sole* objective in pursuing this litigation" is "a shift in political control of the Board," (*id.* at 11 (emphasis in original)), without any factual basis, failing to cite any record evidence or confront Plaintiffs' actual arguments.

Despite CCSD's sound and fury, the key issue in this case is a straightforward one: CCSD has consistently relied on the VRA as a justification for the race-based

redistricting of the Enjoined Plan, despite leaving unrebutted direct proof that the VRA did not, in fact, justify the map-drawing.  Contrary to CCSD's assertions, Plaintiffs have sought only one thing throughout this case: not a particular political configuration of the Board, nor a guarantee of electoral success, but simply relief from the stark racial gerrymander of the Enjoined Plan.  No more, no less.

The district court rightly recognized that simply invoking the VRA as a pretext for racially motivated map-drawing, without even attempting to meet the exacting standards required by *Thornburg v. Gingles*, cannot be permitted.  As a result, the district court preliminarily enjoined the Enjoined Plan as a likely racial gerrymander. In the event that this Court determines that CCSD has standing to file this appeal— which it assuredly does not have—the district court's preliminary injunction order should be affirmed.

## I.    Factual Background.

Throughout this litigation, including in the appeals, CCSD has focused on oblique points in the record while glossing over the central facts, hiding behind post-hoc explanations, and mischaracterizing statements on race as "politics."  The evidence shows race was the driving force behind the creation of the Enjoined Plan, designed to limit Black and Latinx voters' opportunity to elect their candidates of choice to the Board.

CCSD ignores that Cobb County's racial diversification accelerated substantially between the 2010 and 2020 Censuses, fueled primarily by Black and Latinx population growth. (ECF 194-3 (Fairfax Rep.) ¶¶ 29-30.) During this time, the white population of Cobb County declined by 8.8 percentage points—from 57.52% to 48.72%—such that it no longer comprises a majority of the school district. (*Id.* at ¶ 31, Table 1.) Meanwhile, the Black population increased by 3.2 percentage points (from 25.69% to 28.89% of the population) and the Latinx population increased by approximately 2.49 percentage points (from 11.51% to 14% of the population). (*Id.* at ¶ 30, Table 1.)

The demographic changes were also reflected in election results. Before the 2018 election, the seven-member Board was made up of six white members and one Black member. (ECF 194-24 (Davis Decl.) ¶ 4.) The 2018 elections added two Black members, both preferred candidates of Black and Latinx voters. (*Id.*) The trend continued in the 2020 election—a Black member was elected to replace an incumbent Black member, and the preferred candidate of voters of color in District 7 came within approximately three points of defeating the preferred candidate of white voters. (*Id.* ¶ 26.)

CCSD neglects to mention that, facing a razor-thin 4-3 majority, white Board members secretly began the redistricting process as early as "late winter" of 2020 or "early spring of 2021" without telling Black Board members. (ECF 194-7

6

(Floresta/30(b)(6)) Tr. 14:25-15:6; ECF 194-24 (Davis Decl.) ¶ 4.)  In May 2021, then-Board Chair Scamihorn (the "Board Chair") and School District employees John Floresta and Andy Steinhauser met with former State Representative Earl Ehrhart and Jonathan Crumly, both of Taylor English Decisions LLC, and Bryan Tyson of the related law firm Taylor English Duma LLP—where they discussed the Board Chair's principles for a redistricting map.  (ECF 194-12 (Tyson) Tr. 15:5-9, 18:6-9; ECF 194-11 (Steinhauser) Tr. 48:14-18, 51:1-18; ECF 194-18 (May 2021 Redistricting Presentation); ECF 194-13 ("Randy Scamihorn's Principles for Map"); ECF 194-10 (Scamihorn) Tr. 78:17-79:2.)  But it was not until July 2021, two months later, that the issue of redistricting was first raised with the full Board— without any mention of map-drawer Mr. Tyson.  (ECF 194-24 (Davis Decl.) ¶ 27.) The first time Black Board members were made aware of Mr. Tyson was at the next Board meeting on August 19, 2021, where the Board voted 4-3 along racial lines to retain Mr. Tyson.  (ECF 194-24 (Davis Decl.) ¶ 28-32; ECF 194-9 (Howard) Tr. 41:14-43:9.)

Mr. Tyson was merely the "technical hands" for designing the maps, and he testified that he only "carr[ied] out the policy of what the elected official want[ed] to do."  (ECF 194-12 (Tyson) Tr. 43:13-17; 44:16-18.)  Mr. Tyson met or spoke with each Board member individually at least once during this time—except for the Board Chair.  (*Id.* at 41:5-20; ECF 194-10 (Scamihorn) Tr. 97:16-18.)  Instead, the Board

Chair authorized Mr. Steinhauser to speak with Mr. Tyson as his go-between on redistricting, noting a preference to keep "his hands off" his own map. (ECF 194-12 (Tyson) Tr. 53:14-54:9; ECF 194-11 (Steinhauser) Tr. 34:7; 45:10-15; 55:25-56:2.) Mr. Tyson received policy preferences for the Board Chair's map during conversations with Mr. Steinhauser. (ECF 194-12 (Tyson) Tr. 104:21-106:7; *see* ECF 194-13 ("Randy Scamihorn's Principles for Map"); ECF 194-10 (Scamihorn) Tr. 78:17-79:2.)

CCSD further fails to detail the resulting gerrymandered map that packed Black and Latinx voters into three southern districts in Cobb County and reduced dramatically the white population of the northern districts. (ECF 194-1 at 17.) And CCSD entirely neglects to discuss the numerous instances where both Mr. Tyson and Board members testified that VRA compliance was the first priority in drawing and adopting the challenged plan, with zero assertion of partisanship. (ECF 194-1 at 18-19.)

CCSD's recounting additionally ignores the legislative machinations white Board members and legislators undertook to enact the Board Chair's map. After the December 9, 2021 Board meeting where the Board Chair's map was approved in a 4-3 split along racial lines, the Board Chair emailed Georgia State Representative Ginny Ehrhart, requesting that she sponsor the Board Chair's map as legislation.[2]

---

[2] Georgia law requires any plan to revise districts for existing county-level offices to

(ECF 194-17; ECF 194-22; ECF 194-10 (Scamihorn) Tr. 168:10-24.) The map Rep. Ehrhart introduced to the General Assembly, House Bill 1028 ("HB 1028"), included only minor tweaks from the Board Chair's map to remedy technical discrepancies.[3] (ECF 194-21; ECF 194-12 (Tyson) Tr. 151:21-152:21.) To ensure the map's passage, Rep. Ehrhart sidestepped the customary approvals of Cobb County legislators—the majority of whom are Black or Black-preferred candidates—and then avoided assignment to the usual committees for county-level redistricting legislation. (ECF 194-1 at 30-32 (detailing the legislative history.) With limited opportunities for public comment, the House adopted HB 1028 on February 14, 2022, the Senate did the same on February 24, 2022, and Governor Kemp signed HB 1028 into law as Act 561 effective March 2, 2022. (ECF 194-1 at 9.)

## II.  Procedural History.

Plaintiffs challenge a redistricting map that resulted from racial gerrymandering in violation of the Constitution's Fourteenth Amendment. (ECF 1

---

either be drawn or submitted and certified by the Legislative and Congressional Reapportionment Office of the General Assembly. O.C.G.A. § 28-1-14.1(b)(1). As a result, the Board Chair's map was transmitted to the Georgia General Assembly for final legislative action and enactment.

[3] *See* Georgia House, Committee on Governmental Affairs (Feb. 9, 2022), at 0:38:25–0:42:46, https://vimeo.com/showcase/8988922?video=675573182; *see also* ECF 194-39, Georgia House, Committee on Governmental Affairs (Feb. 9, 2022) Tr. 3-4 (unofficial transcript).

at 37.)  The suit named the Cobb County Board of Elections ("Election Defendants")
and its members in their official capacity—the entity charged with implementing the
map—as the Defendants in the action.  Six months after Plaintiffs filed suit against
the Election Defendants, CCSD moved to intervene and "join th[is case] as a
defendant . . . ."  (ECF 52-2 at 1-2.)  Plaintiffs consented "to conserve judicial
resources and ensure that any relief . . . [could] be implemented before the 2024
election cycle" (ECF 54 at 2 n.2), and Election Defendants followed suit (ECF 55).
On January 30, 2023, the district court "added [CCSD] as a defendant."  (ECF 60.)

Just two months later, CCSD moved for judgment on the pleadings and sought
its dismissal.  (ECF 83.)  Election Defendants did not join CCSD's motion, but filed
their own motion to dismiss.  In its motion, CCSD argued that under *Monell v. Dep't
of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978), "Plaintiffs' allegations
fall far short . . . for asserting liability upon the District" and sought to "prevent[] the
District from being liable under Section 1983."  (ECF 83 at 12, 15.)  CCSD
exclusively made its *Monell* arguments about Plaintiffs' claim as against CCSD.  (*Id.*
at 11-12.)  And although CCSD also requested that the district court dismiss
Plaintiffs' claim against the Election Defendants, it failed to make any arguments
specific to them or concerning why CCSD should be permitted to move on behalf of
the Election Defendants.

After oral argument, the district court agreed with CCSD's arguments under *Monell* and granted the Motion for Judgment on the Pleadings on July 18, 2023 ("July Order") (ECF 136),[4] whereby CCSD "lost its status as a Party Defendant and became a non-party" (PI Order at 8, ECF 212).  The district court allowed the case to proceed against the Election Defendants.  Despite having been dismissed from the case at its own request, CCSD, over the repeated objections of Plaintiffs, attempted to continue participating in the action as a self-styled "Adverse Intervenor"—a legally unprecedented status.  (ECF 155.)

Over Plaintiffs' objections, counsel for CCSD continued to appear at depositions and propound discovery requests as a self-described "Adverse Intervenor."  (ECF 155.)  Though CCSD now suggests that it "continued to be regarded as an intervenor" during this time, Plaintiffs maintained in nearly every correspondence to CCSD that it was engaging with CCSD as a courtesy but that CCSD was participating improperly as a nonparty.  (*See, e.g.*, ECF 157-1.)  Plaintiffs ultimately filed an Emergency Motion in the district court to alert the court that

---

[4] At oral argument, the district court also heard argument from the parties regarding Election Defendants' Motion to Dismiss.  (ECF 43.)  In its July Order, the district court denied in part and denied as moot in part Election Defendants' Motion, relying heavily on this Court's decision in *Jacobson v. Florida Secretary of State* to find that the Election Defendants were the proper defendant in Plaintiffs' racial gerrymandering action.  (ECF 136 at 16-17 (citing 974 F.3d 1236 (11th Cir. 2020))).  That issue is not the subject of the instant appeal.

CCSD insisted and was operating as if it was still a party to the action. (*Id.*) Still, CCSD continued to file motions in the district court, including a Supplemental Motion for Judgment on the Pleadings or Alternatively for Summary Judgment on August 16, 2023 (ECF 149) and a Motion to Exclude Plaintiffs' Experts on August 22, 2023 (ECF 155).

On September 12, 2023, the district court held a telephonic status conference ("September Teleconference") where it explained the obvious—that the July Order, made in response to CCSD's own motion, resulted in CCSD no longer being a party. The district court further noted that it could not "find any support at this time for the School District's proposition that it should be able to participate in this case as an adverse intervenor," nor could it "find that term anywhere." (Doc. 59-2 (Sept. 12 Hearing) Tr. at 5:23-6:1.) On October 13, 2023, CCSD filed a notice of appeal from "the order prohibiting [CCSD] from continuing to participate in the case as an intervenor issued orally" during the September Teleconference. (ECF 187.)

On September 28, 2023, CCSD filed a petition for writ of mandamus with this Court. (*In re: Cobb County School District*, No. 23-13185 (11th Cir. 2023), Doc. 1.) The Court denied that request on October 17, 2023, on the basis that CCSD had "other adequate means to attain the relief [it] desires." (*In re: Cobb County School District*, No. 23-13185 (11th Cir. 2023), Doc. 5.)

Thereafter, Plaintiffs and Election Defendants entered into a partial settlement agreement, which explained that Election Defendants were "concerned about the costs of defending [the] lawsuit . . . ." (ECF 190-1 at 4-5.)  Plaintiffs agreed to waive "any right to an award of attorneys' fees, expenses, and costs as against Election Defendants, regardless of whether Plaintiffs' requested relief is granted," while Election Defendants agreed to "take no position" concerning Plaintiffs' forthcoming Motion for Preliminary Injunction ("PI Motion").  (*Id.* 5 ¶ 2, 8 ¶ 11.)  The agreement still required Plaintiffs to present and prove their case to the district court. On October 23, 2023, Plaintiffs filed their PI Motion.  (ECF 194.)

On November 2, 2023, the district court issued a clarifying order denying CCSD's outstanding motions ("November Order") and, to "dispel any uncertainty," directed "the clerk to ENTER JUDGMENT in favor of [CCSD] (effective July 18, 2023) and to TERMINATE [CCSD] from the docket in this action."  (ECF 199 at 16.)  The November Order is the subject of CCSD's second appeal before this Court.[5]

Six days later, the district court granted CCSD leave to file an amicus brief in response to the PI Motion, allowing it to file a brief and two supporting expert declarations.   (ECF 201.)   Plaintiffs asked for leave to respond to CCSD's submission, which the district court granted, and then filed their response.  (ECF

---

[5] This Court later consolidated CCSD's first and second appeals (the "Consolidated Appeals").  (Doc. 43.)

206, 207, 210.)  On December 14, 2023, with CCSD "currently proceeding as an amicus," the district court granted Plaintiffs' PI Motion.  (PI Order, ECF 212.)  In its Order, the district court laid out a remedial schedule that afforded the Georgia General Assembly the first chance to craft a proposed remedy and provided an opportunity for parties to lodge objections, if any.  (*Id.* at 33.)  The schedule was "largely based on proposals [the parties] made in a filing dated September 22, 2023[.]"  (*Id.* (citing ECF 180.))  That schedule called for final determination of a remedy no later than January 22, 2024, in order to allow for implementation by the Election Defendants.  (ECF 180-1.)  On December 19, 2023, CCSD noticed its appeal of the PI Order—CCSD's third appeal to date.  (ECF 213.)

On January 8, 2024—over three weeks after the PI Order was issued—CCSD filed a motion to stay, among other things, the PI Order ("Third MTS"), which it titled "time-sensitive," as well as a "time sensitive" motion to expedite the Third Appeal.  (Dkt. 7, 8.)  Three days later, Plaintiffs filed their opposition to CCSD's Third MTS.  (Dkt. 10.)

This was CCSD's third "time-sensitive" stay motion before this Court.  CCSD first sought a stay of the September Teleconference "order" ("First MTS") (Doc. 17 at 6), which this Court denied without prejudice "with leave to refile should there be a change in its status as an amicus" (Docs. 42, 43).  CCSD then "renewed" its stay

motion, requesting essentially the same relief adding a request to stay the November Order and PI Motion ("Renewed MTS"). (Doc. 56 at 4.)

On January 9, 2024, nearly six months since being dismissed from the case, CCSD filed a "renewed motion" to intervene in the district court, requesting to "re-join" the action to "protect its interests in the subject matter of the case as it enters the remedial stage." (ECF 219 at 1.) That motion is pending.

Also on January 9, 2024, Plaintiffs and Election Defendants filed a joint motion to modify the remedial schedule set forth in the PI Order. (ECF 220.) The request to modify the schedule was based upon new information from the Georgia Secretary of State, who informed Election Defendants that the deadline for finalization and implementation of a remedial map was later than previously thought. (*Id.* ¶ 3.) Although the prior remedial schedule was reasonable and consistent with precedent (*see* Doc. 59 at 18 (collecting cases)), the parties sought to revise the schedule to allow the General Assembly more time to adopt a remedial map in light of the extended deadline for implementation. (ECF 220 ¶ 4.) On January 10, 2024, the district court granted the joint motion. (ECF 221.)

CCSD's Renewed MTS was denied by this Court on January 11, 2024. (Doc. 72.) Also on January 11, 2024, CCSD moved to consolidate the instant appeal, its third, with the first two appeals. (Dkt. 9.) This Court denied this motion that same day. (Dkt. 11.) The first two consolidated appeals remain pending, with oral

argument scheduled for January 30, 2024. On January 12, 2024, this Court expedited CCSD's third appeal. (Dkt. 20.) On its own motion, the Court also ordered expedited briefing. (*Id.*)

Remarkably, also on January 12, 2024—with the benefit of reviewing Plaintiffs' opposition and before filing a reply brief in support of the Third MTS—CCSD submitted its fourth motion to stay ("Fourth MTS"). (Dkt. 16.) The Fourth MTS is nearly identical to the Third MTS, except: (i) it reduces the word count from 6,119 to 4,290; and (ii) addresses the new remedial schedule. (*Compare* Dkt. 7 at 32, *with* Dkt. 16 at 23.) CCSD could have raised arguments about the new remedial schedule in its reply brief or a supplemental brief. Ignoring these procedurally proper avenues, CCSD filed the Fourth MTS without withdrawing the Third MTS. As a result, both substantially similar motions are pending before this Court.

## <u>STANDARD OF REVIEW</u>

Questions of appellate standing are reviewed *de novo*. *LaTele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 9 F.4th 1349, 1357 (11th Cir. 2021).

The district court's decision to issue a preliminary injunction is reviewed for abuse of discretion. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020). The Court of Appeals reviews the district court's legal conclusions *de novo* and findings of fact for clear error. *Id.* The Court's "review under this standard is 'very narrow' and 'deferential.'" *Id.* (quoting *BellSouth Telecomms., Inc. v.*

*MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005)). Appellate courts will not overturn a district court's decision to grant a preliminary injunction unless there is a clear abuse of discretion, "even if [the Court of Appeals] might have reached a different decision." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005). This is because deciding a preliminary injunction requires "a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district court." *Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole Cnty., Fla.*, 468 F. App'x 922, 923 (11th Cir. 2012).

## **SUMMARY OF ARGUMENT**

CCSD adopts a now-familiar tactic in its third appeal, yet again straining the record past the breaking point to portray itself as a victim rather than the master of its own litigation strategy. This Court should not entertain these efforts to exploit the judicial process and should instead dismiss this case for lack of jurisdiction.

First, it is undisputed that CCSD is not a party to the district court action below from which it appeals. CCSD has not been a party to this case since it was dismissed at its own request on July 18, 2023. Whatever rights CCSD erroneously argues it retains despite the grant of its own motion for judgment on the pleadings are not a subject of this appeal.

Second, the exceedingly narrow exception to the rule that only parties may appeal does not encompass CCSD.  CCSD has not offered, and Plaintiffs cannot identify, *any* case in which a party that has successfully asked to be dismissed from a case has standing to appeal a subsequent order.  Indeed, precedent is to the contrary, and finding otherwise would welcome turmoil to judicial proceedings.

Third, if this Court ultimately reviews the merits of this appeal, it should affirm the order below on the preliminary injunction as comfortably within the sound discretion of the district court. *See Schiavo*, 403 F.3d at 1226 (11th Cir. 2005) (noting that appellate courts will not overturn a district court's decision to grant a preliminary injunction unless there is a clear abuse of discretion, "even if [the Court of Appeals] might have reached a different decision").

Here, CCSD again mischaracterizes the record and the controlling law (when it cites to any at all).  Plaintiffs' PI Motion was filed expeditiously and presented extensive evidence that race predominated in the map-drawing process without any justification satisfying strict scrutiny.  Instead of confronting the weight of this evidence head-on, CCSD offers only post-hoc rationalizations that contradict the record.

Finally, the remedial orders below should be affirmed as the district court did not abuse its discretion in providing the Georgia General Assembly with 36 days to

pass a remedial map, which is far more than other courts have awarded in similar circumstances.

## **ARGUMENT**

### I.     **This Court Does Not Have Jurisdiction Over an Appeal Made by a Nonparty.**

CCSD advances two theories of standing.  First, CCSD repeats its misguided argument that it remained either a party or intervenor to the action after the district court's July Order.  (Dkt. 24 ("Br.") 22-26.)  This argument—dragging over the issues from its first two appeals—blows right by this Court's earlier order denying CCSD's request to consolidate all its appeals.  (Doc. 73.)  It also confuses basic tenets of party status and intervention law.  Second, CCSD asserts that it has standing "on equitable grounds," invoking the rare exception to the well-established rule that only parties may appeal adverse judgments.  (Br. 26-27.)  As discussed below, CCSD comes nowhere close to meeting the grounds for this narrow exception.

### A.     **CCSD Is Not a Party and Lacks Standing to Appeal the PI Order.**

This Court must "first determine whether it has proper subject matter jurisdiction before addressing the substantive issues." *Taylor v. Appleton*, 30 F.3d 1365, 1366 (11th Cir. 1994).  Standing to appeal is a jurisdictional requirement. *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353-54 (11th Cir. 2003).  It is well-settled that "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988); *see also Wolff*, 351

F.3d at 1354 ("Generally, one not a party lacks standing to appeal an order in that action."). Because CCSD was not a party to the action when the district court issued the PI Order and is not a party now, CCSD lacks standing and cannot meet this threshold jurisdictional requirement.

CCSD is not a party to this case and has not been a party since July 18, 2023, when the district court granted CCSD's motion for judgment on the pleadings to dismiss it from the case. Nevertheless, CCSD suggests its appeal is proper here because its "ouster as a defendant"—in other words, its dismissal from the case upon the grant of its own motion—was improper, and its "absolute right to remain in the case as an intervenor" persists. (Br. 26.) Whether CCSD somehow retained its status as a party, despite the grant of CCSD's own motion to dismiss it from the case, is not before this Court on this appeal. Rather, it is the subject of CCSD's pending first two appeals. Even assuming that this Court has jurisdiction over those appeals (and Plaintiffs have demonstrated that it does not because, among other things, they represent an appeal by a party from a judgment it requested) and, assuming further that this Court hears those appeals and agrees that the district court wrongly denied CCSD intervenor status (despite, among other things, CCSD not having made a renewed motion to intervene), the undeniable fact is that, as of today, CCSD is not an intervening party in the action below.

20

*Toronto-Dominion Bank v. Central National Bank & Trust Company* presents a useful corollary. 753 F.2d 66, 68 (8th Cir. 1985). There, a third party's motion to intervene had not yet been granted or denied by the district court. *See id.* While it waited for a decision on its intervention, the third party appealed the district court's final judgment. *See id.* The appeals court found that under this posture, the third party had no standing to appeal. *Id.* "Because the motion to intervene has not yet been granted or denied, [the third party's] status remains uncertain and it has no standing to take an appeal or appear as a party." *Id.* at 68. The same goes here. Because the appeals that will resolve CCSD's status in this case are not yet decided, CCSD remains a nonparty to the case and does not have standing to appeal the district court's PI Order. This Court therefore lacks jurisdiction over this appeal.[6]

---

[6] In pressing the argument that it has standing to appeal the preliminary injunction as a nonparty, CCSD ominously asserts that the Election Defendants were nothing more than a token defendant, and the district court committed error by allowing the action to proceed solely against the Election Defendants by what it labels purely procedural grounds. (Br. 24-26.) Nothing could be further from the truth. Plaintiffs named Election Defendants for a simple, uncontestable reason: they are the proper defendant in a suit for prospective injunctive relief brought under *Ex Parte Young*. This is clearly the correct approach under *Jacobson*, which is binding Eleventh Circuit precedent on the issue of proper defendants in election cases. 974 F.3d 1236. Plaintiffs also briefed this issue extensively below, illustrating step-by-step the propriety of naming the Election Defendants under *Ex Parte Young*. (*See, e.g.*, ECF 173 at 13-19.) CCSD's foreboding concerns about the Election Defendants' relationship to the merits of the action are unavailing; as the Supreme Court has held, "the inquiry into whether suit lies under *Ex Parte Young* does not include an analysis of the merits of the claim." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 646 (2002).

### B.    The Narrow Exceptions to the Requirement for the Rule That Only Parties May Appeal Do Not Apply to CCSD.

"Appellate standing is restricted to parties in the absence of most extraordinary circumstances." *United States v. Carter*, 995 F.3d 1214, 1218 (10th Cir. 2021) (citation omitted); *see also Hilao v. Est. of Marcos*, 393 F.3d 987, 992 (9th Cir. 2004). Only on rare occasions have courts allowed for "an exception" to the bedrock principle that only parties have standing to appeal. *Kimberly Regenesis, LLC v. Lee Cnty.*, 64 F.4th 1253, 1261 (11th Cir. 2023). Because CCSD is not a party (and has not been since July 18, 2023) and did not file a new motion to intervene before the grant of the PI Motion, the question is whether this case presents the sort of extraordinary circumstances that would allow CCSD to take advantage of this exception. It does not.

Rather than adopting a specific test for assessing nonparty appeals, this Court has looked to the various tests adopted by sister circuits. *Kimberly Regenesis*, 64 F.4th 1253, 1261 (11th Cir. 2023). These courts have allowed a nonparty to appeal in exceedingly rare circumstances. To determine whether this "limited exception" applies, *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375 (4th Cir. 2018), courts have considered whether (1) the nonparties participated in the proceedings below, (2) the nonparties have a personal stake in the outcome, and (3) the equities weigh in favor of hearing the appeal. *Kimberly*, 64 F.4th at 1261. These standards have never been applied—as far as Plaintiffs have been able to find and as seen by the dearth of

22

authority in its favor unearthed by CCSD—to allow a party that has successfully asked to be dismissed from a case to have standing to appeal a subsequent order or judgment.

First, Plaintiffs do not dispute that CCSD participated in the district court proceedings and that CCSD has an interest in the outcome of this case. But "mere participation in the proceedings below [does] not suffice to confer standing upon a nonparty," and "[a] mere interest in the outcome of litigation will not suffice to confer standing upon a nonparty" either. *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 39, 42 (1st Cir. 2000) (holding that a nonparty lacked standing to appeal a permanent injunction, despite that party, with the lower court's permission, previously submitting briefing in opposition and participating in oral arguments about the appealed injunction).

The first point is obvious: courts cannot allow a nonparty to appeal based solely on participation in the district court. Doing so would invite chaos to judicial proceedings. For that reason, "many levels of active participation will fall below the level required to establish de facto party status." 15A Fed. Prac. & Proc. Juris. § 3902.3 (3d ed.). To that end, courts across the country have held the "limited exception" to the general rule that nonparties lack standing to appeal adverse judgments only arises if a nonparty "actively participated in ***the particular stage of district court proceedings that is challenged on appeal***." *Sky Cable*, 886 F.3d at

384 (emphasis added).  CCSD does not contend that it participated as either a party or intervenor in the court proceedings leading up to the PI Order.  Indeed, to the extent that CCSD participated in this case prior to the issuance of the PI Order, at most, the major result of its participation was its successful bid to be *removed* from the case.

Nor does CCSD's participation as an amicus before the PI Order change the analysis.  Although clear lines have yet to be drawn about the exact contours of this "limited exception," it is well-established that an amicus has no right to appeal a judgment.  *See* 15A Fed. Prac. & Proc. Juris. § 3902.3 (3d ed.) ("An amicus curiae . . . lacks standing to appeal in that role . . . ."); *see also Wyatt By & Through Rawlins v. Hanan*, 868 F. Supp. 1356, 1358–59 (M.D. Ala. 1994) ("[A]n amicus has no right to appeal or dismiss issues.") (citing *United States v. State of Mich.*, 940 F.2d 143, 165–66 (6th Cir. 1991)).

As to CCSD's interest in the outcome, the order it wishes to appeal contains no directive aimed specifically at CCSD.  (PI Order, ECF 212.)  And "the fact that an order has an indirect or incidental effect on a nonparty does not confer standing to appeal." *Dopp v. HTP Corp.*, 947 F.2d 506, 512 (1st Cir. 1991).  That is fatal to CCSD's standing argument.  Courts have held that nonparties may only invoke the "exception to th[e] black-letter rule" that standing is restricted to parties when the "lower court specifically direct[ed] an order at a [nonparty] or enjoin[ed] it from a

course of conduct." *Id.* at 512.  CCSD cannot show either applies here.  As CCSD has repeatedly stated, it is "the Legislature, not [CCSD], that" is entrusted under Georgia law with "adopt[ing]" redistricting maps.  (Br. 32.)  And controlling Eleventh Circuit precedent makes clear that state law imbues the Election Defendants with the authority to implement election maps. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020).  So the PI Order neither directed an order at CCSD nor enjoined it from doing anything.

This narrow reading of whether a nonparty has a "personal stake" in an action makes sense.  Under a broader reading, "Pandora's jar would be open," and anyone with an "interest" in a case—including the many students, parents, teachers, and voters of Cobb County—could "pop in and out of the proceedings virtually at will." *Id.; see also State Farm Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th 1349, 1355 (11th Cir. 2021) (finding that a party with an interest in the case that had previously withdrawn from the litigation and now wanted "a second bite at the apple" could not intervene because it "would result in undue litigation").

Finally, here the equities weigh strongly against favoring an appeal for two reasons.  First, a party who was dismissed from a case but then seeks to appeal subsequent orders simply does not qualify for the nonparty appeals exception. CCSD has not cited to a single case that remotely approaches the circumstances here

and supports a grant of standing to a nonparty such as CCSD. Indeed, the existing authority is decidedly to the contrary.

*Dopp* is particularly instructive on this point. 947 F.2d at 506. The would-be appellant there no doubt had a substantial interest in the appeal: the judgment at issue, annulling an agreement, extinguished the litigant's rights against plaintiff under the agreement. *Id.* at 508. But, similar to what happened here, the would-be appellant had successfully moved to have the claims against it dismissed on grounds other than the merits of the claims. *Id.* at 509. In holding that the would-be appellant lacked standing to appeal, the court explained that the litigant had "departed from the case, on its own motion, long before the [appealed] judgment" and thus its "attempt to reenter the fray on appeal has no visible means of support." *Id.* at 512.

*CalMat Co. v. Oldcastle Precast, Inc.* also presents pertinent parallels to the instant case. 771 F. App'x 866, 867 (10th Cir. 2019). There a limited partnership and its principal were sued for garnishment. *Id.* The principal disclaimed an interest in the case and was dismissed—similar to CCSD's dismissal on the basis that it was not a proper party in this action. *See id.* at 868. Nevertheless, the principal continued to act as if it were a party and attempted to appeal the judgment of garnishment against its limited partnership. *Id.* Despite the principal's clear financial interest in the outcome of the case, the court ruled that the case did not present the

26

"extraordinary circumstances" necessary to allow a nonparty to appeal the judgment. *Id.* at 869.

Second, and just as important, the nonparty appeal exception should not apply when intervention was easily available in the lower court. Here, *Marino* provides authoritative guidance. In *Marino*, the Second Circuit had dismissed an appeal taken by nonparties, but suggested in dictum that there were several exceptions to the rule that only parties may appeal from an adverse judgment. *See Hispanic Soc'y of New York City Police Dep't v. New York City Police Dep't*, 806 F.2d 1147, 1152 (2d Cir. 1986) (discussing *Marino*, 806 F.2d at 1144). The *Marino* Court subsequently affirmed the judgment of the lower court, but added a critical caveat: "The Court of Appeals suggested that there may be exceptions to this general rule, primarily 'when the nonparty has an interest that is affected by the trial court's judgment.' We think the better practice is for such a nonparty to seek intervention for purposes of appeal." 484 U.S. at 304 (citing *Hispanic Soc'y*, 806 F.2d at 1152). In other words, "[w]hile there is an exception to the 'only a party may appeal' rule that allows a nonparty to appeal the denial of a motion to intervene . . . the situation differs when intervention is readily available." *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 39–40 (1st Cir. 2000). In such cases, "courts are powerless to extend a right of appeal to a nonparty who abjures intervention." *Id.*

CCSD's last-minute, back-door attempt to establish standing through the nonparty appeals exception is exactly what the Supreme Court cautioned against in *Marino*. Unsurprisingly, CCSD invokes this exception as part of its effort to portray the procedural history of this case as one in which it is the victim of an unfair process, rather than the master of its own litigation strategy. But in actuality, CCSD became a nonparty by its own request, following the grant of its motion for judgment on the pleadings on July 18, 2023. (ECF 136.) CCSD then continued to appear at depositions and propound discovery requests as a self-described "Adverse Intervenor." (ECF 155.) It then proceeded to file successive motions suggesting it was entitled to perpetual intervenor status that it never asked for. (ECF 149, 155.) Even after the district court made plain in the September Teleconference and the November Order that CCSD had been removed as a party to the case, CCSD still did not file a renewed motion for intervention to properly participate in the case. Instead, it asked to participate as amicus curiae, a request the district court quickly granted. (ECF 201.) If CCSD wanted to become a proper party to this case, it had ample time to do so. But it waited until January 9, 2024, more than 175 days after the grant of its motion for judgment on the pleadings, 26 days after the grant of the PI Motion, and 22 days into the remedial process, to file a renewed motion for intervention. (ECF 219.)

The nonparty appeal exception is not meant to provide a "get out of jail free" card for sophisticated nonparties to appeal at the eleventh hour after they've come to regret their strategic choices. Where, as here, the would-be appellants elected to expand their role and contest the merits of the case while making a strategic choice not to timely intervene in the proceedings, the equities do not favor permitting them to appeal. *See Scandinavia*, 226 F.3d at 41; *see also State Farm Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th 1349, 1355 (11th Cir. 2021); *Texas Brine Co., LLC & Occidental Chem. Corp.*, 879 F.3d 1224, 1228 n.4 (10th Cir. 2018); *Abeyta v. City of Albuquerque*, 664 F.3d 792, 796 (10th Cir. 2011). To the extent CCSD wants to continue to participate in the litigation after winning a judgment in its favor, it has already found the proper avenue to do so: participation as *amicus curiae*. The remedial schedule, as outlined above, allows for participation of amici at every step of the process. CCSD's efforts to take advantage of this narrow nonparty appeal exception should thus be denied.

## II.    If This Court Reaches the Merits of This Appeal, It Should Affirm the Issuance of the Preliminary Injunction.

To obtain a preliminary injunction, a plaintiff must show: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th

Cir. 2006).  The Eleventh Circuit has recognized that a substantial likelihood of success on the merits is "generally the most important." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (cleaned up).  Moreover, "[t]he third and fourth factors merge when, as here, the government is the opposing party." *Id.* (cleaned up).

Here, the sole merits claim assessed by the district court in its decision to issue the preliminary injunction was whether the district lines were the result of an unconstitutional racial gerrymander.  The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering, or the "separat[ing its] citizens into different voting districts on the basis of race," without sufficient justification. *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 187 (2017).  Racial gerrymandering claims involve "a two-step analysis." *Cooper*, 581 U.S. at 291.

First, a plaintiff must prove that "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  To meet this burden, Plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).  While any redistricting analysis begins with the presumption that legislators acted in "good faith," that presumption yields when there is a sufficient showing of race-based districting. *Miller*, 515 U.S. at 915;

30

*see also Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016) ("This presumption must yield . . . when the evidence shows that citizens have been assigned to legislative districts primarily based on their race."), *aff'd sub nom. Cooper*, 581 U.S. 285.

Second, if a court finds racial predominance, the design of the district must withstand strict scrutiny and the State must prove "that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end" in order to be constitutional. *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill,* 580 U.S. at 193). Courts have assumed that VRA compliance is a compelling interest and is narrowly tailored to that end if the State can prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (quoting *Ala. Legislative Black Caucus v. Alabama,* 575 U.S. 254, 278 (2015) ("*ALBC*")). In order for Section 2 of the VRA to form such a strong basis in evidence, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures. *Id.* at 304; *Thornburg v. Gingles*, 478 U.S. 30, 56-58 (1986).

Where courts "have accepted a State's 'good reasons' for using race in drawing district lines," "the State made a strong showing of a pre-enactment analysis with justifiable conclusions," that is, an "actual 'legislative inquiry' that would

31

establish the need for its manipulation of the racial makeup of the district." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

### A.    The PI Motion Was Timely.

While ignoring that it caused delays throughout the lower court proceedings that postponed the development of the evidentiary record necessary for Plaintiffs to seek preliminary relief, CCSD now argues that the district court abused its discretion in granting the PI Motion because Plaintiffs' PI Motion was untimely.  (Br. 27-30.) CCSD's argument contorts the factual record and legal authorities.

Plaintiffs filed their PI Motion less than two months after the close of discovery and seven months before the 2024 election.  Plaintiffs did so despite CCSD's actions that delayed Plaintiffs' discovery efforts, including delaying the deposition of the map-drawer Mr. Tyson until the end of the discovery period, as well as failing to move to intervene until six months after it learned of the lawsuit. (ECF 52.)  Plaintiffs moved for a preliminary injunction as soon as possible after the development of the necessary evidentiary record.  *See Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1300 (M.D. Fla. 2022) ("moving expeditiously" to produce the voluminous record needed for a preliminary injunction supports diligence finding given the "high evidentiary burden" of a racial gerrymandering claim).

CCSD's cases do not support its argument. Of those cited, only two are election cases, and both present extreme circumstances not present here. (Br. 27-28.) In *Benisek v. Lamone*, plaintiffs did not move for a preliminary injunction until *six years* after the map was adopted and waited several years into the litigation to add the claims giving rise to their request for such relief. 138 S. Ct. 1942, 1944 (2018). In *Black Voters Matter Fund v. Raffensperger*, after 200,000 voters were purged in December 2019, the plaintiffs waited a year before seeking a preliminary injunction on December 3, 2020, to reinstate those voters in time for the January 6, 2021, runoff election. 508 F. Supp. 3d 1283, 1289 (N.D. Ga. 2020). These are extreme cases with facts that do not apply here.

CCSD's attempt to create a bright line "one year before an election" rule from *In re Georgia Senate Bill 202*, 2023 WL 5334617 (N.D. Ga. Aug. 18, 2023), is also unavailing. (Br. 29.) As with every motion for equitable relief, the court's analysis was case-specific. Indeed, there the court found plaintiffs acted diligently and harm was imminent. *In re Georgia Senate Bill 202*, 2023 WL 5334617, at *12. So too here.

**B.    The District Court Properly Weighed the Evidence in Determining Race Predominated the Map-drawing Process.**

CCSD argues that the district court abused its discretion in concluding that race predominated in the construction of the Enjoined Plan. (Br. 30-40.) In so arguing, CCSD complains that the district court "ignored" the evidence it filed along

with its amicus brief.  (*See, e.g.*, *id.* at 34, 38, 40, 42, 44.)  Yet the district court was not required to specifically address every argument CCSD made as amicus.  *See Chavez v. Credit Nation Auto Sales, Inc.*, 2014 WL 12780146, at *3 (N.D. Ga. June 5, 2014) (court has discretion to determine extent of amicus' participation); *Golden Gate Rest. Ass'n v. City & Cnty of S.F.*, 546 F.3d 639, 653 (9th Cir. 2008) (courts "need not consider arguments raised solely by an amicus").  In any event, CCSD's flawed arguments contradict both the relevant legal authorities and the record below.

### 1.    CCSD's Cat's Paw Argument Is a Red Herring.

First, CCSD offers an inapplicable "cat's paw" argument, based on the erroneous assumption that the motivations of the Board and its commissioned map-drawer are irrelevant, and only the motivations of the legislature can be considered. (Br. 32-34.)  This argument is a red herring that the district court properly rejected.

Courts necessarily look to the motivations of those who actually drew the map to assess racial gerrymandering claims.  *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 300-01 (2017) (examining the statements and actions of the individuals responsible for drawing the challenged plan—two committee chairs and their hired map-drawer); *Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) (considering "direct evidence of a district-drawer's purpose").  Despite CCSD's contentions, *Brnovich v. Democratic National Committee* says nothing to the contrary.  141 S. Ct. 2321 (2021).  *Brnovich*'s prohibition of "cat's paw" theory concerned imputing motives

34

of a bill's proponents to an entire legislature. *Id.* at 2350. Here, the record demonstrates, and CCSD itself contends, that the General Assembly purposefully adopted CCSD's map and incorporated CCSD's actions into its own decision-making. (Br. 32; ECF 93 at 13-15.) Such ratification does not implicate a cat's paw theory.

CCSD cites a handful of racial gerrymandering cases, fixating on their usage of the word "legislature" to the exclusion of their substantive holdings, to argue that only a legislature's actions matter in a racial gerrymandering action. (Br. 30-31, 33.) CCSD's citation to *Wisconsin Legislature v. Wisconsin Elections Commission* undermines this position. 585 U.S. 398 (2022). That case makes clear that courts look to the conduct of whichever entity is factually responsible for constructing maps, regardless of whether those entities are inside or outside a legislature. *Id.* at 1247. There, the Supreme Court invalidated maps drawn by the Governor of Wisconsin and implemented by the Wisconsin Supreme Court as a racial gerrymander. *Id.* at 1248. No legislature drew the maps at issue in *Wisc. Legis.*, and yet they still violated equal protection. The same dynamic is at play here. *Cf. Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1007-08 (11th Cir. 2018) (statements and actions of those outside the legislature "can be relevant in determining the intent of public officials.").

## 2. CCSD's Partisanship Explanations Are Contradicted by the Record.

CCSD also argues that the Enjoined Plan is the product of partisan, rather than racial, gerrymandering. (Br. 34-40.) This threadbare explanation, made on the basis of post-hoc justifications that contradict the motivations offered during the actual drawing and approval of the Enjoined Plan, should be rejected.

### i. The Overwhelming Weight of the Contemporaneous Record Evidence Negates Any Claim of Partisan Gerrymandering.

CCSD argues that partisanship, not race, explains the enjoined map. (Br. 34-40; *see also* Dkt. 7 at 17-21.) This explanation is post-hoc and unsupported by the record, and CCSD's contentions to the contrary are entirely unconvincing.

To begin, the Board Chair, who supported the Enjoined Plan and defined the priorities for its construction, affirmatively disclaimed partisanship as the predominant goal in the map-drawing process. (ECF 210-1 (Scamihorn) Tr. 68:15-69:14, 167:12-17.) The Board Chair also noted that the majority of the Board supported the hiring of the map-drawer Mr. Tyson and his associates specifically because of their "bipartisan" work history, underscoring that partisanship was not the predominant motivation of decision makers going into the map-drawing process. (*Id.*) Furthermore, the Board Chair testified that all principles that were considered by the Board with respect to the creation of the Enjoined Plan were included in his "Principles for Map," which he furnished to Mr. Tyson and which contain zero

mention of partisanship. (ECF 194-10 (Scamihorn) Tr. 78:11-16.) No Board member ever testified that partisanship was the most important consideration, and most of them actively disclaimed involvement in the map-drawing itself. (ECF 210 at 9 (collecting testimony from Board members).)[7] No member of the Board ever asserted partisan advantage as a motivation, whether in public hearings about the Enjoined Plan or in their deposition testimony. (*Id.*; ECF 194-1 at 44 (citing ECF 194-34, 194-35, 194-36.)

Ignoring all this evidence from the Board itself, CCSD instead focuses on the deposition testimony of Mr. Tyson, standing on his assertions that partisanship was important. (Br. 36-37.) Mr. Tyson's testimony on this point finds zero support in the testimony of the Board members. (ECF 210 at 9-10; *see also supra* 37 at n.7.) His testimony that the Board had instructed him to favor partisanship is also belied by the testimony of Mr. Steinhauser. Mr. Steinhauser purported to represent the Board Chair in the map-drawing process, serving as his liaison with Mr. Tyson. (ECF 194-11 (Steinhauser) Tr. 34:7, 45:10-15, 55:25-56:2.) However, Mr. Steinhauser confirmed at his deposition that the Board Chair did not include partisanship in his communicated priorities. (ECF 194-11 (Steinhauser) Tr. 34:12-15.) No one who can be said to speak for or have any responsibility for the Board's

---

[7] (*See, e.g.*, ECF 210-1 (Scamihorn) Tr. 101:17, 144:2-17, 150:8-13; ECF 210-2 (Banks) Tr. 182:12-20, 233:12-18, 247:15-248:11; ECF 210-3 (Chastain) Tr. 82:12-83:13, 90:17-91:2, 101:2-7.)

decision-making ever even suggested that the goal of the Enjoined Plan was a partisan gerrymander. This eviscerates CCSD's repeated citation of *Easley v. Cromartie*, 532 U.S. 234 (2001). (Br. 34-35.) *Cromartie*'s holding relied on the state "articulat[ing]" a partisanship explanation. (*See id.* at 34 (citing 532 U.S. at 242).) No Board member or their representative ever did so here. Furthermore, the *Cromartie* Court found only that the circumstantial evidence presented by plaintiffs in that case did not show the predominance of race over politics. 532 U.S. at 242-43. By contrast, Plaintiffs here submitted significant circumstantial *and* direct evidence of racial predominance.

So Mr. Tyson's assertions that partisanship was the predominant purpose of the Enjoined Plan stand alone. But even then, neither Mr. Tyson nor CCSD attempt to reconcile this argument with Mr. Tyson's own admissions that he did not make any policy choices associated with the map. Mr. Tyson testified that he viewed his role as being the "technical hands" for the elected Board members, there to faithfully implement their policy choices. (ECF 210-4 (Tyson) Tr. 43:13-18.) Emphasizing this point, Mr. Tyson specifically disclaimed making *any* policy choices associated with the Enjoined Plan. (*Id.* (Tyson) Tr. at 44:7-20.) Even without these concessions, Mr. Tyson's after-the-fact interpretation of events could not supplant the unrefuted testimony of the Board members themselves. But Mr. Tyson's out-of-time contentions wither in the light of his own admissions that he simply

implemented the policy preferences articulated by the Board members, rather than had any responsibility for defining the goals of the Enjoined Plan. *See Harris*, 159 F. Supp. 3d at 614-15 ("Apparently seeing the writing on the wall, the defendants make the passing argument that the legislature configured [the district] . . . for partisan advantage."), *aff'd sub nom. Cooper*, 137 S. Ct. at 1455.

### ii.    CCSD's So-Called Contemporaneous Evidence Consists of Only Two Mischaracterized Emails.

CCSD relies, by its own admission, on only "*two* contemporaneous emails," (Doc. 65 at 5 (emphasis in original)), in its attempt to hand-wave away all this evidence. (Br. 37-38.) These emails cannot bear nearly the weight CCSD places on them. The first email, from Board member Banks, was not even "contemporaneous," as it was sent after the map-drawing was complete, and therefore could not have had any effect on the map's configuration. Indeed, as both Mr. Banks and Mr. Steinhauser confirmed, Mr. Banks had no input on the configuration of the Enjoined Plan, even seeing his own preferences and ideas for the map rejected. (ECF 210-4 (Banks) Tr. 202:6-11, 233:12-18, 224:22-22-225:13; ECF 210-5 (Steinhauser) Tr. 127:3-5.)

CCSD makes even more of the second email, reflecting Mr. Tyson's notes to himself. CCSD contends that these notes reflect detailed analysis of how to best partisan gerrymander the map. (Br. 37.) But this argument is shockingly misleading. As a threshold matter, these notes make *zero* reference to partisanship. (ECF 210-4

(Tyson) Tr. 80:2-81:5.)    Furthermore, when asked directly, Mr. Tyson himself testified that he did not remember what these notes meant.  (*Id.*)  How CCSD contends it can speak authoritatively on these notes' meaning is a mystery.  CCSD's baseless contention that it knows better than Mr. Tyson himself what Mr. Tyson's own notes meant is entitled to no weight whatsoever here.

### iii.    Nothing Offered by CCSD Outweighs Mr. Tyson's Own Testimony That Race Predominated the Map-Drawing.

CCSD contends that these emails, in addition to its interpretations of Mr. Tyson's testimony and Mr. Tyson's declaration (submitted after his testimony had been taken), show "a predominant partisan motive" in the Enjoined Plan.  (Br. 38-39.)  But all of these assertions fall flat in the face of Mr. Tyson's own, uncontested testimony.  Mr. Tyson repeatedly stated that he drew the Enjoined Plan first and foremost by establishing racial targets and drawing district lines that met those targets.  (ECF 194-12 (Tyson) Tr. 98:11-21, 98:24-99:3, 102:14-16.)  Mr. Tyson stated at the Board's December 9, 2021 Work Session that, for purposes of VRA compliance, he drew a majority-Black district in the Enjoined Plan.  (*Id.*)  Mr. Tyson also noted that the other two "majority nonwhite districts" he drew also "could be viewed as Voting Rights Act compliant districts."  (*Id.* (Tyson) Tr. 95:7-11)  To draw all three districts, Mr. Tyson admitted to using "racial information" and "racial data."  (*Id.* (Tyson) Tr. 35:12-15, 37:5-23.)  CCSD does not refute, nor attempt to refute,

these statements.  That is because it cannot.  Mr. Tyson's own testimony irrefutably shows that race predominated in the construction of the Enjoined Plan.

### C. The District Court Did Not Err When It Determined That the Use of Race in the Map-Drawing Process Failed Strict Scrutiny.

The first step in a racial gerrymandering claim, as outlined above, is to determine whether "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916.  Once race predominance is established, strict scrutiny is triggered; the burden then shifts to the government to prove "that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill,* 580 U.S. at 193).  "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'good reasons' for concluding that the statute required its action."  *Id.* (quoting *Ala. Legislative Black Caucus v. Alabama,* 575 U.S. 254, 278 (2015)).

Proving "good reason[] to believe" VRA compliance necessitated race predominance requires demonstrating that there was "good reason to think that all the '*Gingles* preconditions' are met[.]"  (*See* Br. 54-55 (citing *Cooper*, 581 U.S. at 302).)  This means that the map drawer must have analyzed whether: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the

"majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. If, after that analysis, "a State has good reason to think that all the *Gingles* preconditions are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper*, 581 U.S. at 302.

Here, it is undisputed that no one involved in the drawing of the Enjoined Plan undertook the required *Gingles* analysis. (ECF 194-12 (Tyson) Tr. 100:7-10.) The district court therefore properly applied the law in finding that the race-based redistricting in this case did not satisfy the requirements of strict scrutiny, and CCSD relies on a misunderstanding of the relevant legal standards in arguing otherwise.

### 1. CCSD Confuses Standards in Relying on Irrelevant Post-hoc Explanations for the Enjoined Plan.

CCSD highlights Mr. Tyson's testimony that he would have drawn the same districts regardless of VRA considerations, arguing that "[a] racial gerrymandering claim, like any other intentional race discrimination claim, may be defeated by showing that the same decision would have been made without the racial motive." (Br. 52.) But CCSD misses the fact that this is *not* an intentional discrimination claim. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 652 (1993) (finding racial gerrymandering claims "analytically distinct" from deliberate discrimination claims). While an intentional discrimination claim requires showing that *discriminatory intent* was a "motivating factor" in the challenged action, *Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), a racial gerrymandering claim requires showing instead "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Miller*, 515 U.S. at 916. In other words, in a racial gerrymandering case like this one, the relevant question is whether racial considerations predominated the map-drawing process, not whether there was an intent to discriminate. Once race predominance is established, the second question becomes whether the government's use of race can survive strict scrutiny. *Cooper*, 581 U.S. at 292.

CCSD's attempt to defeat the racial gerrymandering claim by showing that Mr. Tyson lacked an intent to racially discriminate is therefore misplaced. Once Plaintiffs demonstrated, as they have, that race did in fact predominate in the construction of the Enjoined Plan—whether or not intentional discrimination was a factor—strict scrutiny is thus triggered. *See, e.g.*, *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) ("[A] racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect. This is true whether or not the reason for the racial classification is benign[.]").[8]

---

[8] Not only is there no requirement that a racial gerrymander be motivated by racial discrimination, courts have found unlawful racial gerrymanders in cases where the motivation was to *increase* minority voting opportunities. *See, e.g.*, *Wisc. Legis*, 595 U.S. at 398; *see also Navajo Nation v. San Juan Cty.*, 929 F.3d 1270, 1280 (10th

In sum: The relevant question here is whether race predominated in the map-drawing process; the uncontroverted answer is yes, and the use of race must therefore be justified by a compelling interest.  Mr. Tyson's testimony indicating he would have drawn the same district even without the VRA in mind does not change those facts.  *See, e.g.*, *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) ("[T]he 'fact that other considerations may have played a role in the County's redistricting does not mean that race did not predominate.'").

And even if CCSD's assertion that the Board's ultimate goal was partisan gain was correct (which it is not), its argument still fails.  Where map-drawers "use race as their predominant districting criterion with the end goal of advancing their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny."  *Cooper*, 581 U.S. at 308 n.7.  Thus, even if one were to credit Mr. Tyson's contradictory, post-hoc partisanship explanation, *Cooper* clearly instructs that this counterfactual would still render the Enjoined Plan an unlawful racial gerrymander.

---

Cir. 2019) ("it makes no difference whether the reason for the classification is benign or the purpose remedial" in racial gerrymandering cases (citation omitted)).

### 2. CCSD Ignores the "Good Reason" Requirement in Arguing That VRA Compliance Justified Its Actions.

CCSD cites the correct standard for determining whether the government's race-based actions meet strict scrutiny, explaining that racial predominance may be justified when there was "*good reason*[] to believe" it was necessary for VRA compliance, and that "good reason" exists where "a State has good reason to think that all the '*Gingles* preconditions' are met." (*See* Br. 54-55 (citing *Alabama Legislative Black Caucus*, 575 U.S. at 278, and *Cooper*, 581 U.S. at 302).) But after citing the right standard, CCSD fails to apply it in its argument.

As CCSD itself explains, "good reason" requires consideration of all three *Gingles* preconditions. Mr. Tyson, though, testified that he did not examine the third *Gingles* precondition anywhere in Cobb County, (ECF 194-12 (Tyson) Tr. 100:7-10), conclusively demonstrating that not all *Gingles* preconditions were considered and that there was therefore not "good reason" to believe that racial predominance was necessary for VRA compliance. CCSD fails to address this fact, instead arguing that the district court found the third *Gingles* factor was not considered because no functional analysis was done. (*See* Br. 55.) This is a gross mischaracterization of the record on this point, as the district court's decision acknowledges: "Plaintiffs' undisputed evidence strongly suggests that [VRA compliance] was merely pretext because Mr. Tyson did not conduct the requisite analysis nor consider the appropriate factors for VRA compliance." (Doc. 212 at 22.) Indeed, Mr. Tyson himself

confirmed that he did not do so.  (ECF 194-12 (Tyson) Tr. 100:7-10.)  In other words, it was not the lack of a functional analysis that was dispositive, but instead the lack of any analysis or consideration at all.  "Good reason" requires consideration of all the *Gingles* factors, which the district court correctly found that Mr. Tyson did not do.

### 3. CCSD Fails to Demonstrate That VRA Compliance Motivated the Race-Based Redistricting.

As outlined above, *supra* Section II.B., it is uncontroverted here that race predominated in the map-drawing process.  That race-based redistricting survives constitutional muster only if it was necessary to serve a compelling interest and was narrowly tailored to meet that goal.  *See Cooper*, 581 U.S. at 292.  VRA compliance can be such a compelling interest.  *See id.* at 302.  But VRA compliance cannot be cited as mere pretext, and cannot by mere invocation constitutionalize race-based line drawing.  More is required, and the record below clearly demonstrates that more was not undertaken.

In its bid to convince the Court that VRA compliance was indeed the motivating factor for using race, CCSD attempts to argue that Mr. Tyson's drawing of District 3 merely maintained a VRA Black-majority district and that the VRA would have prevented Mr. Tyson from changing that district.  (*See* Br. 55.)  But the factual record contradicts CCSD's theory, showing instead that Mr. Tyson repeatedly referred to the "creation" of District 3 throughout the map-drawing process.  (*See,*

46

*e.g.*, ECF 210 at 14-15 (citing December 9, 2021 Board Meeting at 02:55:30-02:56:39 (Tyson: "[T]here's only one area we're able to *create* one majority of a single race district, so that's reflected in this plan.") (emphasis added)).) Moreover taking "deliberate measures to augment [a] district's [minority population]" without a strong basis in evidence for doing so violates the Equal Protection Clause. *Cooper*, 581 U.S. at 303-04. Any purported attempt to rewrite District 3's drawing as a simple bolstering of an existing Black-majority district falls flat. "Section 2 does not force states to perpetuate race-based districts simply because they may have been necessary in the past, or because advocates lobby for them." *Covington v. North Carolina*, 316 F.R.D. 117, 173 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017).[9]

### III. The District Court Did Not Abuse Its Discretion in Providing the Georgia General Assembly With 36 Days to Pass a Remedial Map.

CCSD argues that the deadline the district court has set for the General Assembly to draw a remedial map is "unnecessary" and "arbitrary and unreasonable." It is plainly wrong on both counts.

---

[9] CCSD also points to *Petteway v. Galveston County*, --- F.Supp.3d ---, 2023 U.S. Dist. LEXIS 183978, (S.D. Texas Oct. 13, 2023), to argue that CCSD could have violated the VRA if it had dismantled a majority-Black district. (*See* Br. 57, n.25.) But *Petteway* is inapposite here. The *Petteway* court relied on extensive evidence that showed all three *Gingles* preconditions were satisfied. *See Petteway*, 2023 U.S. Dist. LEXIS 183978 at *131-*146 ("In sum, the court concludes that the plaintiffs have satisfied all three *Gingles* preconditions.") Here, the record shows the opposite—not only were the *Gingles* preconditions not all satisfied, the third precondition was not even considered.

To review, on December 14, 2023, the district court set a remedial process schedule that provided the General Assembly with 24 days to pass a remedial map, ending on January 10, 2024.  Upon learning from Election Defendants mid-day on January 8, 2024, that they could properly implement a remedial map if adopted by the district court on February 9, 2024 (as opposed to the prior deadline of January 22, 2024), Plaintiffs and Election Defendants submitted a joint motion to extend the time for the General Assembly to adopt a remedial map by twelve days.  The district court granted that motion, providing the General Assembly with a total of 36 days to pass a remedial map, ending on January 22, 2024.

CCSD suggests the February 9, 2024 deadline is "unnecessary," because the Election Defendants "previously have indicated they have implemented a new county-wide map in as little as four weeks," but it misunderstands the schedule proposed. (Br. 49.)  Under the new remedial schedule, the Election Defendants will implement the new map in less than four weeks.  The February 9, 2024 deadline provides the Election Defendants approximately three and a half weeks to do so before the first day of the candidate qualifying period and the first day to request absentee ballots on March 4, 2024.  As Plaintiffs presented to the district court back in August of 2023, "Election Defendants have implemented county-wide maps within a period of four to six weeks prior to the relevant candidate qualifying deadline." (ECF 156-2 at 7.)  In other words, as it stands, the new remedial schedule

approved by the district court provides the Election Defendants with less time than it normally has to implement a new map in order to provide the General Assembly with as much time as possible to pass its own remedial map.

Next, CCSD complains that the January 10 legislative deadline was "impossible" and that the January 22 deadline is "arbitrary and unreasonable." (Br. 47.) This is, by necessity, a time-limited process. It is typical for legislatures to be granted relatively short periods of time to draw maps. Thirty-six days is in fact far more than other courts have awarded in similar circumstances, even in cases involving far more complex maps than a single county school board map. *See, e.g.*, *Harris*, 159 F. Supp. 3d at 627 (statewide congressional maps to be redrawn within two weeks); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1357 (N.D. Ga. 2004) (state legislative maps to be redrawn within 20 days), *aff'd*, 542 U.S. 947, (2004); *Calvin v. Jefferson Cnty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (county maps to be redrawn within 16 days). CCSD ignores that the Governor of Georgia had the ability to call a special legislative session earlier to redraw the map, as it did just weeks prior to the setting of the remedial schedule in this case. GA. CONST. art V. § II, para VII; Governor of Georgia Brian Kemp, Proclamation (Oct. 26, 2023). So, too, the legislature could adjust its other "legislative priorities" to take up the drawing of a remedial map. (Br. 48.)

Finally, CCSD argues that because the new remedial schedule allows for other proposed remedial maps to be submitted to the court two days after the General Assembly's remedial map is submitted, the district court's "intent" is to view the General Assembly's map "on par" with other proposed maps. (Br. 49-50.) Not so. Plaintiffs have repeatedly made clear to the court that the legislature must have the first opportunity to draw the map. (*See, e.g.*, ECF 180 at 2-3 ("Plaintiffs stipulate that the relief requested in Plaintiffs' motion for preliminary injunction will be that the Court give the legislature the first opportunity to draw a new map"); ECF 194-1 at 52 n.32 ("should Plaintiffs prevail on this motion, Plaintiffs request that the Court give the legislature the first opportunity to draw a new map."); ECF 220 at 2-3 ("[P]arties seek to modify the remedial proceedings to provide the General Assembly with additional time to adopt a remedial map").)

The new remedial schedule provides a brief window for Parties and Amici to respond to the legislative map and present alternative proposals two days after the legislative deadline so the court can be fully briefed in time to make a decision by February 9, 2024. This approach accords with all relevant case law that provides the legislature with "a reasonable opportunity" to pass a remedial map. *See Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (collecting cases). Perhaps for this reason, CCSD cites no case law indicating the structure of this remedial process is impermissible. CCSD instead baselessly asserts that the remedial process will not

afford any deference to any legislatively enacted remedial proposal, instead claiming that such a map would be treated "on par with other proposed maps." (Br. 50.) There is no evidence to support this contention, and as all the case law Plaintiffs have cited throughout the proceedings below clearly states, any remedy proposed and enacted by the legislature would be afforded the deference it is due. *See, e.g.*, *Wise*, 437 U.S. at 540 ("The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution.")  Given the foregoing, the remedial schedule in place is plainly not an abuse of discretion.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that this Court dismiss the appeal for lack of jurisdiction or, in the alternative, affirm the district court's December 14, 2023 grant of the preliminary injunction.


Dated: January 18, 2024         Respectfully Submitted,

*/s/ Michael Tafelski*

Bradley E.  Heard (Ga. Bar No.  342209)
Pichaya Poy Winichakul (Ga. Bar No. 246858)
Michael Tafelski (Ga. Bar No. 507007)
Sabrina S. Khan*
SOUTHERN POVERTY LAW CENTER
150 E.  Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
(404) 521-6700

bradley.heard@splcenter.org
poy.winichakul@splcenter.org
michael.tafelski@splcenter.org
sabrina.khan@splcenter.org


Jeff Loperfido
Christopher Shenton
SOUTHERN COALITION FOR SOCIAL
JUSTICE
5517 Durham Chapel Hill Blvd
Durham, NC 27707
(919) 323-3380
jeffloperfido@scsj.org
chrisshenton@scsj.org


Caitlin May (Ga. Bar No. 602081)
Cory Isaacson (Ga. Bar No. 983797)
ACLU FOUNDATION OF GEORGIA,
INC.
P.O. Box 570738
Atlanta, Georgia 30357
(678) 310-3699
cmay@acluga.org
cisaacson@acluga.org


Jon Greenbaum
Ezra D. Rosenberg
Julie M. Houk
Sofia Fernandez Gold
Heather Szilagyi
Javon Davis
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org

jhouk@lawyerscommittee.org
sfgold@lawyerscommittee.org
hszilagyi@lawyerscommittee.org
jdavis@lawyerscommittee.org

Douglas I. Koff**
Thomas L. Mott**
Jacqueline Maero Blaskowski**
Paul Schochet**
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022 (212) 756-2000
Douglas.Koff@srz.com
Thomas.Mott@srz.com
Jacqueline.MaeroBlaskowski@srz.com
Paul.Schochet@srz.com

*Admitted Pro Hac Vice
**Admissions to the 11th Circuit Pending

Counsel for Plaintiffs Karen Finn, Dr. Jillian Ford, Hylah Daly, Jenne Dulcio, GALEO Latino Community Development Fund, Inc., New Georgia Project Action Fund, League of Women Voters of Marietta-Cobb, and Georgia Coalition For The People's Agenda, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: January 18, 2024                              */s/ Michael Tafelski*
                                                    Michael Tafelski

                                                    *Counsel for Plaintiffs*

<u>**CERTIFICATE OF COMPLIANCE**</u>

I certify this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because this document contains 12,318 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 18, 2024

*/s/ Mike Tafelski*
Mike Tafelski

*Counsel for Plaintiffs*